UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
=====================================================

Chandy Bounkhoun,

                                    Plaintiff,          **Report and Recommendation**

          v.                                            15-CV-631A

Steven E. Barnes, Esq. et al.,

                                    Defendants.

=====================================================

## I.    INTRODUCTION

Plaintiff Chandy Bounkhoun suffered permanent blindness in one eye when she was struck by a rock thrown from a lawnmower that her landlord was using.  Plaintiff retained defendants Steven E. Barnes, Esq., Ross M. Cellino, Esq., Christopher D. D'Amato, Esq., and Cellino & Barnes, P.C. to pursue a personal injury action against the landlord.  The case went to trial and ended in a defense verdict; under the terms of a high-low agreement, plaintiff was awarded $25,000 minus costs and fees.

The above summary sounds simple enough, but plaintiff asserts that she could have obtained a much higher settlement award if her attorneys had listened to her instructions to pursue settlement negotiations.  Instead, according to plaintiff, defendants ignored her instructions and concealed the landlord's insurer's willingness to continue settlement talks, all in an effort to obtain a trial verdict large enough to give them the fees that they wanted.  Plaintiff also believes that defendants pushed her to sign the high-low agreement for their own benefit.  Plaintiff consequently filed suit here, asserting claims of conversion, conversion conspiracy,

misrepresentation, a violation of New York Judiciary Law § 487, legal malpractice, and a violation of New York General Business Law §§ 349 and 350. Defendants asked plaintiff to withdraw all of the claims except the legal malpractice claim on the basis that the other claims were frivolous. When plaintiff refused, defendants filed two motions that now are pending: a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP") (Dkt. No. 10); and a motion for sanctions under Rule 11. Despite refusing to withdraw any claims before defendants filed the motions, plaintiff withdrew most of the claims in question after defendants filed the motions. The parties continue to disagree over the legal sufficiency of plaintiff's claims under Judiciary Law § 487.

The Hon. Richard J. Arcara referred this case to this Court under 28 U.S.C. § 636(b)(1)(B). (Dkt. No. 12.) The Court has deemed the motions submitted on papers under FRCP 78(b). For the reasons below, the Court respectfully recommends granting the motions in part.

## II.    BACKGROUND[1]

This diversity[2] case concerns allegations that defendants spiked a settlement in plaintiff's personal-injury case to pursue a verdict that would bring higher attorney fees, without keeping plaintiff informed of their decisions. On June 7, 2008, plaintiff's landlord was using a lawnmower, presumably at or near plaintiff's residence. The lawnmower threw a rock that struck plaintiff and blinded her in one eye. A few days later, on June 11, 2008, plaintiff signed a retainer agreement and retained defendants on a contingency basis. The last sentence of the retainer

---

[1] For the sake of brevity, the Court will avoid repeated uses of the words "alleged" or "allegedly" when describing plaintiff's allegations. Nothing in this Background section constitutes a factual finding unless otherwise noted.

[2] When this case began, plaintiff was a citizen of Texas and all defendants were citizens of New York. As explained below, the Court has looked at certain information outside the pleadings for the limited purpose of confirming proper venue.

agreement read, in all caps, "NO SETTLEMENT SHALL BE MADE WITHOUT FULL KNOWLEDGE AND CONSENT OF BOTH ATTORNEY AND CLIENT." (Dkt. No. 11-4 at 2.) Defendants proceeded to commence litigation in New York State Supreme Court, Erie County. When litigation commenced or what might have happened during early proceedings is not clear from the amended complaint.

The events that led to this case began around January 27, 2012, the date of a certain pretrial conference in state court. On that date, the state court apparently set a trial date of July 9, 2012. Around the same time, plaintiff's landlord's insurer informed defendants that it would be willing to settle the state litigation for $100,000. Defendants informed plaintiff's family accordingly; defendants had to communicate with plaintiff through family because plaintiff is Laotian and does not speak English. The amended complaint does not contain any information about what response plaintiff or her family ever gave defendants about the insurer's offer. The amended complaint instead asserts that plaintiff and defendants had no communication between approximately January 27 and June 4, 2012. Around June 4, 2012, plaintiff, through family, advised defendants that she would be willing to settle the state litigation for $150,000. Defendants ignored the apparent request to explore settlement and responded only by telling plaintiff that the litigation was scheduled to proceed to trial on July 9, 2012. The litigation did in fact proceed to trial as scheduled. After jury selection, defendants had plaintiff sign a high-low agreement. The high-low agreement does not appear to be part of the record, and the description of its operation in the amended complaint is a little vague. Nonetheless, the gist of the agreement appears to have been that plaintiff was guaranteed a payout of $25,000 even with a defense verdict, while the

3

insurer was guaranteed a cap of $750,000 in the event of a verdict for plaintiff. The jury returned a defense verdict, and plaintiff received the award of $25,000 minus costs, fees, and liens, for a net payout of $7,256.30. (Dkt. No. 15 at 21.)

The events outlined above do not capture plaintiff's beliefs about what was occurring behind the scenes at defendants' office as the case headed to trial. According to the amended complaint, when plaintiff informed defendants of her desire to settle the state litigation for $150,000, defendants rejected that valuation as only a fraction of their own. Defendants did not tell plaintiff, however, that they considered her valuation too low; they also did not make any communication to persuade her to reconsider her desire to settle. Instead, and without telling plaintiff, defendants sent counsel and the insurer in the state litigation a settlement demand letter for $1 million. (Dkt. No. 15 at 14–16.) The insurer rejected the demand a few days later and, at least on the face of the document, left the door open for continued negotiations. (*Id.* at 18–19.) Defendants did not inform plaintiff of the insurer's response.

As asserted in the amended complaint, plaintiff believes that defendants' handling of her state litigation makes sense only when seen from the perspective of self-dealing. Plaintiff has accused defendants of conspiring "to manipulate the outcome of the plaintiff's case in such a manner so as to maximize their own potential return by minimizing their own risk and maximizing the risk to the plaintiff without advising the plaintiff of their conspiratorial actions and the risks their actions created for the plaintiff." (Dkt. No. 9 at 3.) With respect to the high-low agreement, plaintiff believes that defendants "conspired to secure a high-low agreement from the insurance carrier on terms that were favorable to the carrier and very detrimental to the plaintiff so that they

4

could attempt to secure a larger attorneys fee by trying plaintiff's case and limit their risk on any outstanding litigation expenses by agreeing to a very low amount for the lower limit on the high-low agreement." (*Id.* at 5.) Plaintiff contends that another factor affecting defendants' conduct is the way in which their law firm uses attorneys as independent contractors despite marketing a different relationship. (*Id.* at 2.) Finally, plaintiff believes that defendants' lack of concern for her state litigation included a lack of concern about poor translation of her testimony at trial. (*Id.* at 5.)

Plaintiff filed the original complaint in this case on July 13, 2015 and the amended complaint on November 16, 2015. The amended complaint contains five counts. In Count I, plaintiff accuses defendants of conspiring to convert, and actually converting, "the plaintiff's complaint in the underlying action into their own property and to prosecute that for their own purposes without any regard to the requests of the client." (Dkt. No. 9 at 5.) In Count II, plaintiff accuses defendants of misrepresentation, specifically misrepresenting "the fact that the case could have been settled by the defendants by engaging in competent settlement negotiations." (*Id.* at 6.) In Count III, plaintiff accuses defendants of violating New York Judiciary Law § 487 because they "engaged in a course of conduct to deceive and defraud the plaintiff of her rightful monies, being untruthful and nefarious in accomplishing their own ends to the prejudice of the plaintiff." (*Id.* at 7.) In Count IV, plaintiff accuses defendants of legal malpractice. In Count V, plaintiff accuses defendants of violating New York General Business Law §§ 349 and 350 by engaging in deceptive and misleading business practices. Defendants violated the statute in that "the firm by using the term 'team of trial lawyers' at Cellino and Barnes is attempting to project a relationship that does not in fact exist and the actual relationship between the assigned

attorney, the firm and client creates an irrevocable conflict of interest for the assigned attorney. The assigned attorney has dual loyalties to the firm as an independent contractor and to the client, and those dual loyalties in the underlying case giving rise to this action, were never disclosed to the plaintiff and are never disclosed to the public at large." (*Id.* at 8.)

Defendants filed their pending motions on November 16, 2015. With respect to the motion to dismiss, defendants are not seeking to dismiss Count IV of the amended complaint. Defendants seek to dismiss all of the other counts and any request for punitive damages. According to defendants, the conversion and conspiracy allegations fail because New York does not recognize civil conspiracy and because plaintiff has not pled all of the elements of a conversion claim. Plaintiff's claim for misrepresentation would fail because New York law does not allow a misrepresentation claim that duplicates a claim for legal malpractice. Defendants assert that claims under the Judiciary Law must show conduct constituting a criminal misdemeanor (Dkt. No. 10-3 at 12), and that plaintiff in contrast has pled legal malpractice at most. Defendants argue against any assertions under the General Business Law on the basis that any internal organization at defendants' law firm has no impact on the product that the law firm offers to the public. Finally, defendants argue that plaintiff has not shown the kind of wantonness or malice that would support punitive damages. In defendants' view, plaintiff's inability to plead the necessary elements for most of her claims makes most of her claims frivolous to the point of warranting Rule 11 sanctions. Defendants argue further that even a modest research effort would have shown plaintiff that many of her allegations are unsustainable under New York law.

Plaintiff takes a mixed approach in opposing defendants' motions. Plaintiff has withdrawn Counts I, II, and V, focusing instead on defending Count III and opposing Rule 11 sanctions. (Dkt. No. 15 at 1 ¶ 2; Dkt. No. 16 at 4.) To that end, plaintiff has filed extensive factual affidavits with numerous exhibits that consist of email messages and other documents (Dkt. Nos. 14 and 15). As for arguments, plaintiff argues that she has adequately pled a Judiciary Law violation by pleading that self-interest permeated both the $1 million settlement demand letter and the structure of the high-low agreement. Plaintiff also asserts that she has good reason to believe that the insurer's file for the state litigation will uncover communications from defendants that confirm the real reason for the high-low agreement—that "by securing that agreement the plaintiff's case could be tried knowing that any trial expenditures to be incurred would be covered." (Dkt. No. 16 at 8.) Plaintiff tried unsuccessfully to obtain the insurer's file during the state litigation and now asks the Court for an opportunity to pursue it during discovery here.

## III.    DISCUSSION

Of the two pending motions, the Court will address the motion to dismiss first. Whether Count III survives dismissal will affect whether sanctions might be appropriate under Rule 11.

### A.  Motion to Dismiss

#### i.    Motions to Dismiss Generally

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a

probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). Courts assess Rule 12(b)(6) motions "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 61 (2d Cir. 2010) (internal quotation marks and citation omitted). "On a motion to dismiss, the court may consider any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference." *Yak v. Bank Brussels Lambert*, 252 F.3d 127, 130 (2d Cir. 2001) (editorial and internal quotation marks and citation omitted). "Simply stated, the question under Rule 12(b)(6) is whether the facts supporting the claims, if established, create legally cognizable theories of recovery." *Cole-Hoover v. Shinseki*, No. 10-CV-669, 2011 WL 1793256, at *3 (W.D.N.Y. May 9, 2011) (internal quotation marks and citation omitted).

As a preliminary matter, the Court must decide whether to consider a number of documents that have become part of the record but lie outside of the amended complaint. "Because a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may review only a narrow universe of materials. Generally, we do not look beyond facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (internal quotation and editorial marks and citation omitted). "Where a document is not

incorporated by reference, the court may neverless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint. However, even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks and citations omitted). "A document is integral to the complaint where the complaint relies heavily upon its terms and effect. Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering limited quotations from the document is not enough. In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint." *Goel*, 820 F.3d at 559 (internal quotation and editorial marks and citations omitted).

Applying this standard, the Court can consider a few of the documents in the record. There is an affirmation in the record that, *inter alia*, confirms that plaintiff's underlying personal injury occurred within the Western District of New York. (Dkt. No. 14 at 1.) The information about the location of the incident explains the assertion in the amended complaint that venue is proper in this District. (Dkt. No. 9 at 1 ¶ 2.) The Court will consider the affirmation for that limited purpose. Next, the record contains copies of plaintiff's retainer agreement with defendants. (*See, e.g.*, Dkt. No. 11-4 at 2.) The retainer agreement confirms the existence of an

9

attorney-client relationship between the parties (*see* Dkt. No. 9 at 2 ¶ 12), a critical factual predicate to most if not all of plaintiff's allegations. The Court will consider the retainer agreement as needed. The record contains copies of a settlement demand letter that defendants sent to counsel and the insurer in the state litigation, along with the insurer's response. (Dkt. No. 15 at 14–19.) Plaintiff refers to these letters explicitly in the amended complaint, and the letters are important examples of events that allegedly occurred without her knowledge. Without otherwise assessing the substance of the letters, the Court will review them for the limited purpose of confirming a settlement demand of $1 million dated June 21, 2012 and a response with a stated willingness to negotiate that was dated June 28, 2012. Finally, the record contains a copy of a final settlement statement between the parties after the jury verdict in the state litigation. (Dkt. No. 15 at 21.) In the absence of any copies of the high-low agreement or of the jury verdict, the Court will review the settlement statement for the limited purpose of confirming that there was a defense verdict that triggered a $25,000 payment to plaintiff under the terms of the high-low agreement. The Court will not consider any of the other outside documents that the parties have filed. Although allegations in the amended complaint refer to events that purportedly are explained in greater detail within the documents, the documents themselves are not integral to the basic assertion of any of plaintiff's claims. At most, the documents are evidence, and "[t]he court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985) (citation omitted).

*ii.    Count III and N.Y. Judiciary Law § 487*

The Court now turns to Count III and plaintiff's assertion of a violation of Judiciary Law

§ 487. Since Section 487 is fairly short, the Court for convenience will reprint the entire text here:

An attorney or counselor who:

> 1. Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party; or,

> 2. Wilfully delays his client's suit with a view to his own gain; or, wilfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for,

Is guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

N.Y. Jud. L. § 487 (Westlaw 2017). "[S]ection 487 is not a codification of a common-law cause of

action for fraud. Rather, section 487 is a unique statute of ancient origin in the criminal law of

England. The operative language at issue—'guilty of any deceit'—focuses on the attorney's intent to

deceive, not the deceit's success . . . . Further, to limit forfeiture under section 487 to successful

deceits would run counter to the statute's evident intent to enforce an attorney's special obligation

to protect the integrity of the courts and foster their truth-seeking function." *Amalfitano v.

Rosenberg*, 903 N.E.2d 265, 268 (N.Y. 2009) ("*NY Amalfitano*") (citation omitted). The operative

language from *Amalfitano* is the same operative language that plaintiff invoked in paragraph 59 of

the amended complaint, and it merits a closer look. What Section 487 proscribes, and what

remedies it makes available, will help the Court determine the sufficiency of Count III.

"Our first step in interpreting a statute is to determine whether the language at issue has a

plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry

must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent. The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340–41 (1997) (internal quotation marks and citations omitted). When courts have to examine specific terms in statutes, and the statutes do not provide definitions for those terms, judges will give the terms their ordinary meaning. *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 89 (2d Cir. 2016) (citations omitted). "A 'common and ordinary' meaning may include another statutory definition from a similar context, a dictionary definition, or a common-law definition." 2A Norman Singer and Shambie Singer, *Sutherland Statutory Construction* § 47:7 (7th ed. and 2017 Supp.) (citations omitted); *see also, e.g., Boumediene v. Bush*, 553 U.S. 723, 776 (2008) ("When interpreting a statute, we examine related provisions in other parts of the U.S. Code.") (citations omitted); *Walters v. Metro. Educ. Enterprises, Inc.*, 519 U.S. 202, 207 (1997) ("In the absence of an indication to the contrary, words in a statute are assumed to bear their ordinary, contemporary, common meaning.") (internal quotation marks and citation omitted). Courts have to use caution when relying solely on dictionary definitions of terms that ordinary people in everyday life would understand in a different way. "Whether a statutory term is unambiguous, however, does not turn solely on dictionary definitions of its component words . . . . Ordinarily, a word's usage accords with its dictionary definition. In law as in life, however, the same words, placed in different contexts, sometimes mean different things." *Yates v. United States*, 135 S. Ct. 1074, 1081–82 (2015) (citations omitted).

The first term in Section 487(1) that requires closer examination is the term "deceit."  New

York's Judiciary Law does not define the term as used in any of its sections, including Section 487.

That said, the New York Court of Appeals in *NY Amalfitano* traced the use of the term "deceit" in

Section 487 all the way back to Magna Carta and noted the consistent understanding of that term

as applied to attorneys representing clients in litigation.  Specifically, the New York Court of

Appeals quoted with approval two principles from an old Appellate Division case that interpreted

a predecessor statute with substantially identical language.[3]  The first principle is that the

prohibition against deceit in Section 487 and its ancestors applies to attorneys, "a peculiar class of

citizens, from whom the law exacts a reasonable degree of skill, and the utmost good faith in the

conduct and management of the business intrusted to them . . . To mislead the court or a party is

to deceive it."  *NY Amalfitano*, 903 N.E.2d at 268 (ellipsis in original) (quoting *Looff v. Lawton*, 14

Hun 588, 589 (N.Y. App. Div. 1878)).  The second principle is that "deceit" for purposes of

Section 487 is more expansive than the meaning that developed under the common law.  Since

the New York Court of Appeals embraced the understanding of "deceit" from *Looff*, a full passage

from that case is appropriate here.  In *Looff*, the plaintiffs owned a parcel of real estate that they

wanted to sell.  They retained an attorney, who in short told them that their title was bad and that

the sale would require judicial proceedings that netted the attorney a significant amount in costs

and fees.  The plaintiffs sued to recover the costs and fees, claiming that the attorney deceived

them about the quality of their title.  The trial court dismissed the case for failure to state a

---

[3] The Court, with gratitude for library assistance, has tracked down a near-contemporary copy of that predecessor from the 1881 Penal Law.  *See* Appendix A attached to this Report and Recommendation.  The language of that predecessor is identical in all substantive respects to the current Section 487.

sufficient cause of action, but the Appellate Division reversed. Here is what the Appellate Division

said about how the predecessor in question operated to expand the concept of attorney deceit

beyond the bounds of the common law:

> The common law, as well the statute, relating to the offense of obtaining property
> by false pretenses, were adequate to the punishment of all such offenses, whether
> committed by lawyers or laymen. Moreover such an offense being punishable by
> imprisonment in a State prison, comes under the statutory definition of a felony.
> At common law, also, fraud and damage gave a civil action to the party injured.
> There was no occasion, therefore, for another statute to punish, or to give an action
> for the 'deceit' of lawyers, unless the Legislature intended that that class of persons
> should be liable for acts which would be insufficient to establish a crime or a cause
> of action against citizens generally. The statute is limited to a peculiar class of
> citizens, from whom the law exacts a reasonable degree of skill, and the utmost
> good faith in the conduct and management of the business intrusted to them. An
> attorney or counsellor who advises ignorant adult owners of land that they are not
> competent to convey it, and thereby induces them to employ him to institute a suit
> in partition, and incur the expense thereof, for the purpose of effecting a sale of the
> [land] gives them erroneous advice, and thereby misleads them to their injury, and
> if he is qualified to perform the functions of an attorney, he does it knowingly. To
> mislead the court or [a] party is to deceive it; and, if knowingly done, constitutes
> criminal deceit under the statute cited.

*Looff*, 14 Hun 588, 1878 N.Y. App. Div. LEXIS 1, at *4–5, *aff'd*, 97 N.Y. 478, 480 (1884).

Bringing the principles from *Looff* back to Section 487, by way of *NY Amalfitano*, the meaning of

"deceit" in the statute now can be understood. As used in Section 487, "deceit" by an attorney

means misleading a court or a party by saying or doing anything that exploits the trust that courts

and parties place in attorneys as officers of the legal system. *Looff* and *NY Amalfitano* addressed

affirmative conduct, but there does not appear to be any reason to exclude the absence or omission

of something said or done if the absence or omission would result in the same exploitation of

trust. Including absences and omissions is important to plaintiff's case here. Plaintiff's allegations

have an element of affirmative conduct with respect to some conduct at trial and the inducement

14

to sign the high-low agreement. The weight of plaintiff's allegations, however, lie in defendants' omission of information from plaintiff to the insurer about the possibility of settling the case for $150,000; and in the omission of information from the insurer to plaintiff about a willingness to continue negotiations. If those omissions caused the same misleading and the same exploitation of trust as affirmative conduct then their status as omissions by itself should make no difference.

*Looff* also addresses another term in the operative language of Section 487: "intent." Simply put, when attorneys exploit the trust that courts and parties place at them and wind up misleading those courts or parties, as long as the attorneys are licensed and in good standing— "qualified to perform the functions of an attorney"—the conduct is done knowingly. The treatment of "intent" that the New York Court of Appeals has endorsed by embracing *Looff* again demonstrates the desire to expand the reach of Section 487 beyond what might have been available under the common law to address deceitful conduct from attorneys.

The last term to assess from the operative language of Section 487 is "guilty." The word appears twice in Section 487, once in Section 487(1) as a condition of determining "deceit"; and once at the end of Section 487, when a finding of deceit with the requisite intent—among other conditions not relevant to this case—authorizes a factfinder to pronounce a misdemeanor conviction. The Judiciary Law does not give the term "guilty" any definition peculiar to that statute or to Section 487 in particular. Four other sources of information offer some guidance instead. In ordinary parlance, people use the word "guilty" literally to mean criminal guilt, whether they have an exact burden of proof in mind or not; they also use the word more generally to mean that someone is confirmed to have committed some kind of transgression against

15

someone else.  The more general understanding of the word "guilty" is not persuasive here,

considering the consequences to an attorney's reputation that would follow from a finding of

deceit and a misdemeanor conviction.  Black's Law Dictionary offers some guidance as well,

defining "guilty" as either "having committed a crime; responsible for a crime" or "responsible for

a civil wrong, such as a tort or breach of contract."  *Guilty*, Black's Law Dictionary (10th ed. 2014).

The former definition carries more weight in this circumstance because the direct consequence for

guilt under Section 487 is a misdemeanor conviction.  Appendix A shows that Section 487, in all

substantive respects, has not changed at all since it rested in the Penal Law, adding to the Court's

sense that "guilty" there means what it usually means in criminal prosecutions.  *See also Neroni v.

Becker*, No. 3:12-CV-1226 GLS/DEP, 2014 WL 2532479, at *4 (N.D.N.Y. June 5, 2014)

("Furthermore, in addition to the fact that the plain language of § 487 criminalizes deceitful or

fraudulent conduct by attorneys, New York state courts have consistently recognized that § 487 is

rooted in criminal law.  Accordingly, the state could have sought to commence criminal

proceedings under § 487.") (citations omitted).  Finally, a strong source of guidance comes from

the widespread convention in statutes and common law that guilt refers to criminal wrongdoing

while "liable" or something similar refers to civil wrongdoing.  *See, e.g., Elonis v. United States*, ___

U.S. ___, 135 S. Ct. 2001, 2011 (2015) ("Elonis's conviction, however, was premised solely on

how his posts would be understood by a reasonable person.  Such a 'reasonable person' standard is

a familiar feature of civil liability in tort law, but is inconsistent with the conventional requirement

for criminal conduct–awareness of some wrongdoing.") (citation omitted); *Resnick v. Resnick*, 722

F. Supp. 27, 37 (S.D.N.Y. 1989) ("New York law provides, however, that a defendant may be held

liable for a [civil] conspiracy to do an unlawful thing, or to do a lawful thing in an unlawful

manner.") (citations omitted); N.Y. Gen. Bus. Law § 815 (using the phrase "shall be liable" when

assessing civil penalties); N.Y. Envtl. Conserv. Law § 71-2729 (same); N.Y. Workers' Comp. Law

Appx. § 316.5 (same). The above guidance persuades the Court to conclude that, for purposes of

Section 487, "guilty" refers to establishing misdemeanor criminal liability beyond a reasonable

doubt. Section 487, at its core, then, is a criminal statute like its immediate predecessor—former

Penal Law section 273—and like its ancestor statutes dating back centuries.[4] That the term "guilty"

appears twice in the statute seems a little repetitive, but given that the statute operates to assess

misdemeanors, the repetition simply is an explicit rendering of the principle in criminal law that

every individual element of an offense must be established beyond a reasonable doubt. *See, e.g.,*

*United States v. Viafara-Rodriguez,* 729 F.2d 912, 913 (2d Cir. 1984) (citations omitted).

If the core of Section 487 operates as a criminal statute then what should the Court make

of the civil clause attached at the very end? After pronouncing an attorney with the necessary

elements guilty of a misdemeanor, Section 487 says that "*in addition to* the punishment prescribed

therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil

action" (emphasis added). "In addition to" suggests newer options that are layered or that open up

alongside older, pre-existing ones. *See, e.g., Medtronic, Inc. v. Lohr,* 518 U.S. 470, 500 (1996)

(finding that 21 U.S.C. § 360k(a) does not preempt common-law state tort claims because they are

---

[4] Again with library assistance, the Court also has reviewed the most relevant parts of the bill jacket that
accompanied the passage of Section 487. The bill jacket generally indicates a desire from the Legislature to
remove from the Penal Law any criminal provisions that administrative agencies could address on their
own. Nothing that the Court has reviewed from the bill jacket suggests that Section 487 is no longer a
primarily criminal statute simply because it does not lie in the Penal Law. The parts of the bill jacket that
the Court has reviewed are attached to this Report and Recommendation as Appendix B.

not state requirements for medical devices that are "different from, or in addition to" federal regulations); *Leist v. Simplot*, 638 F.2d 283, 313 (2d Cir. 1980) (holding that a private right of action under the Commodity Exchange Act was a new remedy in addition to older remedies); *In re Roberts*, 514 B.R. 358, 362 (Bankr. E.D.N.Y. 2014) (interpreting the definition of a bankruptcy estate in 11 U.S.C. § 1306(a) to add property "in addition to" property described in 11 U.S.C. § 541(a)(5)); *Anemone v. Metro. Transp. Auth.*, 410 F. Supp. 2d 255, 269 (S.D.N.Y. 2006) (describing how the alteration of a plaintiff's rights in "stigma plus" litigation—that is, the "plus"—"must be *in addition to* the stigmatizing statements") (emphasis added).  People who are wronged by a deceitful attorney thus have the option or pursuing criminal or civil redress, or both, but only after misdemeanor guilt is established.  The plain language of the statute says that any civil penalty of treble damages comes *on top of* whatever the New York Penal Law authorizes as a punishment for misdemeanors.  *See Amalfitano v. Rosenberg* ("*SDNY Amalfitano*"), 428 F. Supp. 2d 196, 210–11 (S.D.N.Y. 2006) ("The wording of the statute thus makes it clear that the civil remedy is in addition to the criminal sanction for the same conduct.").  If the statute does not allow a factfinder to reach criminal or civil remedies before first reaching a misdemeanor conviction then any civil remedies under Section 487 must require a misdemeanor conviction as a prerequisite.  *See Melcher v. Greenberg Traurig, LLP*, 11 N.E.3d 174, 175 (N.Y. 2014) ("Judiciary Law § 487 *exposes an attorney who is guilty* of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party *to criminal (misdemeanor) liability and treble damages*, to be recovered by the injured party in a civil action.") (internal quotation and editorial marks omitted) (emphasis added).  No particular criminal penalty would be required, just the conviction itself.  The New York Court

of Appeals in *NY Amalfitano* implicitly recognized the dependence of the civil penalty on the criminal conviction when it assessed the history of Section 487 and wrote that, in the late 19th century, "[t]he Legislature later codified this misdemeanor crime *and the additional* civil forfeiture remedy as section 148 of the Penal Code of 1881." *NY Amalfitano*, 903 N.E.2d at 268 (emphasis added). Layering a civil penalty on top of a criminal conviction and penalty is not unheard of—federal asset forfeiture upon conviction is just one example—and is consistent with the idea that the New York Legislature considered attorney deceit especially repugnant.

Cases that have addressed the civil remedy under Section 487 do not change any of the above analysis. These cases simply do not explain in any depth why the statute should read to provide a civil remedy independent of any misdemeanor conviction. For example, in *Sabatini Frozen Foods, LLC v. Weinberg, Gross & Pergament, LLP*, No. 14-CV-02111 DLI CLP, 2015 WL 5657374, at *4 (E.D.N.Y. Sept. 23, 2015), the court described in one sentence that Section 487 is a "law [that] supports a civil action by a party to a litigation against the attorneys representing parties in the litigation." That case offered no analysis of the phrase "in addition to" and how that phrase routes any civil remedy through a misdemeanor conviction. *Sabatini* quoted *SDNY Amalfitano* but without acknowledging that *SDNY Amalfitano* did not treat treble damages under Section 487 as an independent civil remedy. The Second Circuit in *Schertenleib v. Traum*, 589 F.2d 1156, 1166 (2d Cir. 1978), noted in passing that Section 487 "authorizes recovery of treble damages by any party injured because of a deceit practiced on a court by an attorney." That mention of Section 487 is silent about the relationship between misdemeanor convictions and treble damages; if anything, support for this Court's analysis could be drawn from the Second

19

Circuit's passing comment that Section 487 "is rather intended to regulate, through criminal *and* civil sanctions [not "or"], the conduct of litigation before the New York courts." *Id.* (emphasis added). The issue of prerequisites was addressed explicitly but selectively in *Schindler v. Issler & Schrage, P.C.*, 692 N.Y.S.2d 361, 362 (N.Y. App. Div. 1999). There, the Appellate Division did write explicitly that "[a]lthough a violation of § 487 is also a misdemeanor, a criminal conviction is not a condition precedent to a civil action pursuant to the section." *Id.* Two problems weaken the conclusion in *Schindler*, however. First, immediately before the conclusion that the Court just quoted, the Appellate Division quoted Section 487 but omitted the language about a misdemeanor conviction and the phrase "in addition to" with a selectively placed ellipsis. *See id.* ("Judiciary Law § 487 provides, inter alia, that an attorney who is 'guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party . . . forfeits to the party injured treble damages, to be recovered in a civil action.'") (ellipsis in original). Second, the Appellate Division, while omitting language from Section 487, added a requirement that plaintiffs seeking treble damages have to demonstrate "a chronic, extreme pattern of legal delinquency." *Id.* at 363 (internal quotation marks and citations omitted). This Court has no idea whence the additional requirement came and is not the first court to express the same confusion. "It would appear that some courts in New York have imposed an additional prerequisite to recovery: that the plaintiff in a section 487 action show 'a chronic and extreme pattern' of legal delinquency by the defendant. That requirement appears nowhere in the text of the statute, however, and other courts have found attorneys liable under the statute for a single intentionally deceitful or collusive act." *Amalfitano v. Rosenberg*, 533 F.3d 117, 123 (2d Cir. 2008) ("*Second*

20

*Circuit Amalfitano*") (citations omitted).  This Court can only guess that the additional requirement was a grudging half-acknowledgment of the criminal prerequisite—that is, a misdemeanor conviction would not be literally required, but a high level of civil proof akin to a misdemeanor conviction would be.

    *Schindler*, in turn, cited *Wiggin v. Gordon*, 455 N.Y.S.2d 205, 209 (N.Y. Civ. Ct. 1982), which found in Section 487 "a clear willingness to allow an injured party to pursue civil remedies against a delinquent attorney independently and prior to criminal proceedings, if any."  The court in *Wiggin* rested its conclusion on three sources.  The court referred to N.Y. Statutes Law § 275, which states, "Generally, statutes which are semi-criminal or remedial in nature are not strictly construed."  The court explicitly cited to the commentary for Statutes Law § 275, which states that "[w]here a penal statute is such that it is a hybrid of civil and criminal remedies capable of definite severance, that part of it which relates to and grants a civil remedy must be read separate and distinct from that part of it which is penal in character and viewed as a separate and independent enactment and construed and interpreted accordingly."  N.Y. Stat. Law § 275 comment.  Without explanation, though, the *Wiggin* court omitted the rest of the paragraph after that sentence:

> Stated differently, a statute beneficial to the public, though penal as to some persons, will receive an equitable construction, in order not to defeat its general as well as specific purpose.  For example, a statute designed to protect the public from the menace of automobiles operated without proper supervision, such as those operated by drunken drivers, or a statute requiring signals to be given upon the approach of a locomotive to a crossing, and prescribing a penalty for its violation, should not receive a strict construction.  So, too, a statute designed to compel telegraph companies with extensive lines to receive from other companies messages which such other companies could transmit no further, though penal to the offender, is generally beneficial and is equitably construed.  Also, a statute giving stockholders of a corporation the right to examine its transfer books and to copy

> the names of the stockholders, and prescribing a penalty for a denial of the right
> should be construed equitably.

*Id.* The rest of the paragraph demonstrates that the thrust of Statutes Law § 275 is to separate the strict construction of criminal penalties from the broader equitable construction of civil penalties. Strict versus equitable construction has nothing to do with the simple requirement in Section 487 that any treble damages be "in addition to" a preceding misdemeanor conviction. The *Wiggin* court also cited *People v. Connolly*, 164 N.Y.S.2d 66, 67 (App. Div. 1957), which addressed Section 487's immediate predecessor. The Appellate Division there reversed a trial court dismissal of an information charging an attorney with two false statements under then-section 273 of the Penal Law. The opinion is very short, but it suggests that the trial court dismissed the information because the false statements in question were filed outside of any pending action and because the complainant had alternative remedies available. The Appellate Division concluded that the filing of false statements with the trial court "would constitute a deceit with intent to deceive the court within the purview of the stated Penal Law provision. Pendency of an action is not a necessary ingredient of the offense. It is immaterial that section 273 of the Penal Law also provides in the disjunctive that a deceit practiced upon a party is not only a misdemeanor but that the party injured may recover treble damages." *Id.* A full context shows that the Appellate Division in Connolly was not addressing the situation at hand here—an attempt to use Section 487 for civil relief in the complete absence of any criminal charges. Finally, the *Wiggin* court cited *Fields v. Turner*, 147 N.Y.S.2d 542 (Sup. Ct. 1955). *Fields* seems to have a factual scenario much closer to this case, and is much more useful to the Court because it confirms that the text of former section

273 of the Penal Law was identical to Section 487.  In *Fields*, a client sued his attorney for treble

damages, again under the former section 273 of the Penal Law.  No criminal charges ever were

brought against the attorney.  The attorney moved to dismiss the complaint based on arguments

including that treble damages under section 273 first required a criminal conviction.  The court

rejected the argument and denied the motion.  The court first decided that the language of the

statute, even with the phrase "in addition to," did not suffice as "a clear and unmistakable

statement that the civil action may be brought only after a criminal conviction under the section."

*Id.* at 544.  The court did not give a specific explanation for that decision but cited a broader

principle that "[c]ivil remedies as a general rule are not affected in any manner by the pendency or

outcome of a criminal prosecution, see Penal Law, § 24.  Where a statute grants a civil as well as a

criminal remedy, the two are separable, Fainblatt v. Leo Sportswear Co., Inc., 178 Misc. 760, 36

N.Y.S.2d 695, dealing with Penal Law, § 964; McK. Unconcol. Laws, § 8591, dealing with treble

damages by tenants for overcharges; Lien Law, § 36–a."  *Id.*  Even under New York law, however,

the starting point for statutory construction is the actual language of the statute.  *See, e.g., Roberts v.*

*Tishman Speyer Properties, L.P.*, 918 N.E.2d 900, 906 (N.Y. 2009); *People v. Santi*, 818 N.E.2d 1146,

1151 (N.Y. 2004).  Section 487 unambiguously establishes the elements of a misdemeanor

conviction and then opens the door to the possibility of civil treble damages.  In the face of the

statute's clear language, this Court finds *Fields* unpersuasive.

　　*Melcher* offers a hint as to why there has been confusion over the years about the

prerequisite of a misdemeanor conviction for treble damages.  In *Melcher*, the New York Court of

Appeals had to decide which statute of limitations applied to a claim of common-law attorney

deceit.  In answering that question, the New York Court of Appeals noted that the state recognized both a statutory claim for treble damages under Section 487 and a much older common-law claim for attorney deceit.  *See Melcher*, 11 N.E.3d at 176 ("But an action for attorney deceit is not necessarily an action to recover under a statute just because it may be traced back to the first Statute of Westminster rather than common-law fraud.").  Without making any formal finding, the Court suggests that maybe those courts that have found no prerequisite to treble damages under Section 487 actually had common-law attorney deceit in mind.

Where does all of the above analysis leave plaintiff?  Plaintiff has pled that defendants ignored her desire to settle her case, and walked away from ongoing negotiations without her knowledge.  Plaintiff has pled further that defendants engineered a high-low agreement at trial that essentially gave their costs higher priority than her permanent loss of an eye.  Whatever proof might emerge at discovery, the claim of legal malpractice in the amended complaint—Count IV, which defendants have not moved to dismiss—would appear to cover the full range of plaintiff's allegations.  The Court is not aware of any prosecution of defendants under Section 487, and plaintiff in any event has not pled nearly enough detail to show that defendants might have fulfilled all of the elements of Section 487 and might be guilty of a misdemeanor.  Without fulfillment of the elements of a criminal offense under Section 487, and a resulting conviction, this case presents no criminal prerequisite that treble damages can be "in addition to."

Under these circumstances, Count III of the amended complaint fails, and the Court thus recommends granting defendants' motion with respect to Count III.  Since Count III fails as a matter of law, the Court need not address plaintiff's arguments about the need to obtain discovery.

24

### iii. *Remainder of Motion to Dismiss*

Since plaintiff has withdrawn Counts I, II, and V, the portions of defendants' motion addressing those counts now are moot, and the Court recommends denying them accordingly.

The only part of defendants' motion that remains unaddressed is the part seeking a dismissal of plaintiff's demand for punitive and exemplary damages. Plaintiff made that demand only for Counts I through III of the amended complaint. (Dkt. No. 9 at 8.) Since making the demand, plaintiff has withdrawn Counts I and II explicitly (Dkt. No. 16 at 4). Defendants have asserted that plaintiff also withdrew any demands for punitive damages. The Court does not quite see where that withdrawal occurred, although plaintiff does appear at least to have abandoned the demand for punitive damages. In any event, upon adoption of this Report and Recommendation, Count III would be dismissed, leaving the demand for punitive damages moot. The Court accordingly recommends denying this aspect of defendants' motion as moot.

### B. Motion for Sanctions Under Rule 11

The Court now will turn to defendants' motion for sanctions under Rule 11. Under Rule 11, when attorneys present courts with pleadings, written motions, or other documents, the presentation by itself constitutes a certification to the attorneys' best knowledge, information, and belief after a reasonable inquiry. FRCP 11(b). The certification covers four different responsibilities; two of those responsibilities seem most relevant here. Attorneys certify that their filings are "not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation," FRCP 11(b)(1); and that their filings "are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing

existing law or for establishing new law," FRCP 11(b)(2). When attorneys violate Rule 11(b), courts may impose sanctions that are "limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." FRCP 11(c)(4); *see also* FRCP 11(c)(2) ("If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion."). "The standard for triggering the award of fees under Rule 11 is objective unreasonableness, and is not based on the subjective beliefs of the person making the statement." *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 387 (2d Cir. 2003) (internal quotation and editorial marks and citation omitted). That said, "[m]erely incorrect legal statements are not sanctionable under Rule 11(b)(2)." *Id.* at 391; *see also Fishoff v. Coty Inc.*, 634 F.3d 647, 654 (2d Cir. 2011) ("The fact that a legal theory is a long-shot does not necessarily mean it is sanctionable. The operative question is whether the argument is frivolous, i.e., the legal position has no chance of success, and there is no reasonable argument to extend, modify or reverse the law as it stands.") (internal quotation marks omitted). Also, "[w]ithout objectively unreasonable statements, economic disparity and a greater litigiousness do not alone amount to improper purpose." *Storey*, 347 F.3d at 393. "[I]n imposing rule 11 sanctions, the court is to avoid hindsight and resolve all doubts in favor of the signer." *Oliveri v. Thompson*, 803 F.2d 1265, 1275 (2d Cir. 1986).

Applying the above standards, the Court is most concerned about the timing of plaintiff's withdrawal of Count I, Count II, and Count V from the amended complaint. At least since

26

October 23, 2015, defendants have believed that Count I and Count V were frivolous. On that date, defense counsel served plaintiff's counsel with a "safe harbor" letter as required under Rule 11(c)(2). (Dkt. No. 11-2 at 2–19.) Plaintiff's counsel responded with a letter dated November 11, 2015 that defense counsel apparently received on November 14, 2015. (Dkt. No. 11-3 at 2–3.) In his response, plaintiff's counsel doubled down. Plaintiff's counsel defended the claims in the amended complaint by suggesting that unnamed "eminently qualified" legal experts endorsed the substance of the claims. Plaintiff's counsel labeled the safe-harbor letter "particularly offensive" and "an affront to the profession" and made thinly veiled threats about seeking his own sanctions and disqualifying defense counsel based on a conflict of interest. Since the amended complaint was not "withdrawn or appropriately corrected within 21 days after service" of the safe-harbor letter, FRCP 11(c)(2), defendants went ahead and filed the pending motion for sanctions. *Cf. Gambello v. Time Warner Commc'ns, Inc.*, 186 F. Supp. 2d 209, 229 (E.D.N.Y. 2002) (refusal to withdraw a claim exposed as frivolous led to sanction of $1,000 payable to the Clerk of Court). Suddenly, just over a month later, plaintiff's counsel announced the withdrawal of Count I, Count II, and Count V. (Dkt. No. 16 at 4.) Plaintiff's counsel has offered no explanation of what happened in that month to pivot 180 degrees from the response to the safe-harbor letter. In the absence of any explanation at all, let alone an objectively reasonable one, the Court is left to consider Counts I, II, and V frivolous as of their filing. *See United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1344 (2d Cir. 1991) ("Pleadings, motions, and other papers must be justifiable at the time they are signed; this Court will not countenance belated rationalizations concocted to conceal chicanery.") (citation omitted).

The response to the safe-harbor letter, as part of the procedure under Rule 11(c)(2), also looks

utterly frivolous and calculated to intimidate defense counsel. *Cf. City of Yonkers v. Otis Elevator

Co.*, 844 F.2d 42, 49 (2d Cir. 1988) (affirming a sanction of $5,000 for frivolous claims where the

plaintiff "waited to withdraw the causes of action until after defendants' summary judgment papers

were filed"). Plaintiff's counsel has to account for attempted intimidation and for making defense

counsel conduct the research, drafting, and filing of a motion that addressed the now-withdrawn

counts. *Cf. Diamond v. Simon*, No. 89 CIV. 7061 (PKL), 1992 WL 15046, at *3 (S.D.N.Y. Jan. 17,

1992) (sanctioning an attorney $3,277.50 where the attorney "refused to undertake any curative

steps that would allow this litigation to proceed until plaintiffs' counsel had to go through the time

and expense of filing the instant motion"); *Gutterman v. Eimicke*, 125 F.R.D. 348, 355 (E.D.N.Y.

1989) (reimbursing the defendants $12,555 in attorney fees when the plaintiff failed to withdraw

"abusive litigation" earlier). The only mitigating factor in plaintiff's counsel's favor is that

defendants' motion to dismiss was partly necessary under any circumstances. The parties disagreed

about Count III, and the Court needed to look at unsettled New York case law. Accordingly, the

Court recommends5 sanctioning plaintiff's counsel in the amount of $2,000, payable to

---

5 Whether imposing sanctions counts as dispositive is unsettled in the Second Circuit. The closest that the
Second Circuit has come to addressing the issue is two conflicting concurring opinions in the same case.
*Compare Kiobel v. Millson*, 592 F.3d 78, 86 (2d Cir. 2010) (Cabranes, J., concurring) ("I am persuaded by the
reasoning of the Sixth and Seventh Circuits holding that a magistrate judge is not authorized to issue an
order imposing Rule 11 sanctions. I reach this conclusion because a Rule 11 motion for sanctions, though
it arises in the context of an underlying action, is the functional equivalent of an independent claim.") *with
id.* at 99 (Leval, J., concurring) ("At the time of the Sixth and Seventh Circuit decisions, the analogy to both
contempts and awards of damages argued in favor of the conclusion that Congress had withheld the
sanction power. Now the much stronger analogy—the similarity to contempt adjudications—forcefully
argues, indeed as an *a fortiori* case, that Congress intends magistrate judges to exercise sanctioning power.").
Out of caution, the Court presents its conclusion about sanctions as a dispositive recommendation.

defendants' law firm of record in this case. The Court recommends denying defendants' Rule 11 motion to the extent that it seeks any other relief.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting defendants' motion to dismiss (Dkt. No. 10) in part to dismiss Count III of the amended complaint. The Court recommends denying the rest of the motion as moot.

The Court also recommends granting defendants' motion for sanctions (Dkt. No. 11) in part to sanction plaintiff's counsel in the amount of $2,000, payable to defendants' law firm of record in this case. The Court recommends denying defendants' motion to the extent that it seeks any other relief.

## V.    OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days. *See* 28 U.S.C. § 636(b)(1); FRCP 72. "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

_____/s Hugh B. Scott_____
Hon. Hugh B. Scott
United States Magistrate Judge

DATED: April 11, 2017