UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

Chandy Bounkhoun,

          Plaintiff,

  v.

Steven E. Barnes, Esq. *et al.*,

          Defendants.

**Decision and Order**

15-CV-631A

---

## I. INTRODUCTION

Plaintiff Chandy Bounkhoun suffered permanent blindness in one eye when she was struck by a rock thrown from a lawnmower that her landlord was using. Plaintiff retained defendants Steven E. Barnes, Esq., Ross M. Cellino, Esq., Christopher D. D'Amato, Esq., and Cellino & Barnes, P.C. to pursue a personal injury action against the landlord. The case went to trial and ended in a defense verdict; under the terms of a high-low agreement, plaintiff was awarded $25,000 minus costs and fees.

The above summary is not the end of the story. Plaintiff asserts that she could have obtained a much higher settlement award if her attorneys had listened to her instructions to pursue settlement negotiations. Instead, according to plaintiff, defendants ignored her instructions and concealed the landlord's insurer's willingness to continue settlement talks, all in an effort to obtain a trial verdict large enough to give them the fees that they wanted. Plaintiff also believes that defendants pushed her to sign the high-low agreement for their own benefit. Plaintiff consequently filed suit here. Now pending are four different motions from different parties and non-parties: plaintiff's motion to compel non-parties Hilary Banker, Esq. ("Banker") and New York Central Mutual Insurance Company ("NYCM") to comply with certain subpoenas that were served on them

(Dkt. No. 60); defendants' motion to compel plaintiff's deposition and to amend the scheduling order (Dkt. No. 62); NYCM's motion to quash the subpoena that plaintiff served on it (Dkt. No. 63); and Banker's motion to quash the subpoena that plaintiff served on her (Dkt. No. 67.)

## II.  BACKGROUND

### A.  *General Case Overview*

This diversity[1] case concerns allegations that defendants undermined a settlement in plaintiff's personal-injury case to pursue a verdict that would bring higher attorney fees, without keeping plaintiff informed of their decisions. On June 7, 2008, plaintiff's landlord William Adolph Jr. ("Adolph") was using a lawnmower at or near plaintiff's residence. The lawnmower threw a rock that struck plaintiff and blinded her in one eye. A few days later, on June 11, 2008, plaintiff signed a retainer agreement and retained defendants on a contingency basis. The last sentence of the retainer agreement read, in all caps, "NO SETTLEMENT SHALL BE MADE WITHOUT FULL KNOWLEDGE AND CONSENT OF BOTH ATTORNEY AND CLIENT." (Dkt. No. 11-4 at 2.) Defendants proceeded to commence litigation in New York State Supreme Court, Erie County.

The events that led to this case began around January 27, 2012, the date of a certain pretrial conference in state court. On that date, the state court set a trial date of July 9, 2012. Around the same time, Adolph's insurer, NYCM, informed defendants that it would be willing to settle the state litigation for $100,000. (Dkt. No. 28 at 4.) Defendants informed plaintiff's family accordingly; defendants had to communicate with plaintiff through family because plaintiff is Laotian and does not speak English. According to the second amended complaint—the current operative pleading— plaintiff had no communication with defendants between January 27 and June 4, 2012. (*Id.* at 4.) On June 4, 2012, plaintiff, through a family representative, allegedly informed defendants that she

---

[1] When this case began, plaintiff was a citizen of Texas and all defendants were citizens of New York.

2

would be willing to settle her case for $150,000. (*Id.*) According to plaintiff, defendants responded the next day and informed plaintiff only about the July 9, 2012 trial date. Defendants allegedly did not tell plaintiff about NYCM's settlement offer; did not tell NYCM about plaintiff's settlement offer; and did not tell plaintiff about the bad-faith letter that they would send to NYCM on June 21, 2012 demanding the full policy value of $1 million. (*See id.* at 4–5; Dkt. No. 60-2 at 9–11.) The litigation proceeded to trial as scheduled. After jury selection, defendants had plaintiff sign a high-low agreement. The high-low agreement does not appear to be part of the record, but the gist of the agreement was that plaintiff was guaranteed a payout of $25,000 even with a defense verdict, while the insurer was guaranteed a cap of $750,000 in the event of a verdict for plaintiff. (Dkt. No. 28 at 7.) The jury returned a defense verdict, and plaintiff received the award of $25,000 minus costs, fees, and liens, for a net payout of $7,256.30. (Dkt. No. 15 at 21.)

As asserted in the second amended complaint, plaintiff believes that defendants' handling of her state litigation makes sense only when seen from the perspective of self-dealing. Plaintiff has accused defendants of conspiring "to manipulate the outcome of the plaintiff's case in such a manner so as to maximize their own potential return by minimizing their own risk and maximizing the risk to the plaintiff without advising the plaintiff of their conspiratorial actions and the risks their actions created for the plaintiff." (Dkt. No. 28 at 5.) With respect to the high-low agreement, plaintiff believes that defendants "conspired to secure a high-low agreement from the insurance carrier on terms that were favorable to the carrier and very detrimental to the plaintiff so that they could attempt to secure a larger attorneys fee by trying plaintiff's case and limit their risk on any outstanding litigation expenses by agreeing to a very low amount for the lower limit on the high-low agreement." (*Id.* at 7.) Plaintiff contends that another factor affecting defendants' conduct is the way in which their law firm uses attorneys as independent contractors despite marketing a different

3

relationship. (*Id.* at 3.) Finally, plaintiff believes that defendants' lack of concern for her state litigation included a lack of concern about poor translation of her testimony at trial. (*Id.* at 7.)

**B.     Plaintiff's Subpoenas and the Pending Motions**

As the summary above indicates, the core of plaintiff's allegations can be described as a discrepancy between two sets of communications: the communications that defendants ought to have had with plaintiff and NYCM; and the communications that they actually had. To help explore the discrepancy, plaintiff has issued two non-party subpoenas. One subpoena, served on NYCM, seeks "(1) Any and all correspondence, notes, telephone call logs, or emails between employees of your company and employees of Cellino & Barnes, P.C. relating to the settlement of Bounkhoun v. Adolf file no. 2008-00571 [and] (2) the reserve sheet for said file." (Dkt. Nos. 60-2 at 5; 63-2 at 2.) The other subpoena—served on Banker, defense counsel in the state court case—similarly seeks "(1) Any and all correspondence, notes, telephone call logs , electronic communications between you, or personnel employed by your office and Christopher D'Amato, Esq. or any principal or employee of Cellino & Barnes, P.C. relating to the settlement or negotiations of the Bounkhoun v. Adolf action, (2) Any independent medical records or reports, [and] (3) any evaluations regarding damages or liability." (Dkt. No. 67-2 at 1.)

Plaintiff's subpoenas prompted two of the four pending motions. On January 3, 2020, NYCM filed a motion to quash under Rules 26(b)(3) and 45(d)(3). (Dkt. No. 63.) NYCM argues that its subpoena "seeks NYCM's evaluations of, and discussions regarding, the liability and damages aspects of the plaintiff's personal injury lawsuit, including the reserve set for the case. That information clearly is not discoverable; therefore the subpoena should be quashed." (Dkt. No. 63-1 at 4.) With respect to the reserve that NYCM might have set for the state court case, it asserts immunity about reserve information and argues that "whether plaintiff's former attorneys

4

committed malpractice should not depend on what NYCM had set as its reserve. The reserve information is unnecessary for the continued prosecution of the plaintiffs lawsuit. Therefore, plaintiff does not have a substantial need for the reserve information." (*Id.* at 5.) Additionally, according to NYCM, "[i]f there were any written communications between Cellino & Barnes and NYCM regarding a settlement, plaintiff can obtain those documents from Cellino and Barnes through the normal discovery process. If plaintiff was unsatisfied with defendants' responses, she should have filed a motion to compel further responses rather than subpoenaing clearly privileged information from NYCM." (Dkt. No. 63-1 at 5.) On January 8, 2020, Banker filed her own motion to quash. (Dkt. No. 67.) Banker asserts that plaintiff sought essentially the same information from her in the state court case and had her request denied by the state court judge. (Dkt. No. 67-1 at 2.) Banker thus believes that collateral estoppel applies to plaintiff's renewed attempt to obtain information from her. Banker also argues that her file from the state court case would contain privileged correspondence between her and Adolf and

> would also contain correspondence to the insurance adjuster containing my analysis of the current litigation and my strategy for further handling. This would include strategy with regard to experts to be obtained, witnesses to be called at trial, evidence to be presented at trial, the appearance (good or bad) of various witnesses, opinions regarding Plaintiffs injury and value of same, and strategy with regard to settlement negotiations. In fact, the subpoena served by Plaintiff's counsel specifically requests any evaluations regarding liability or damages. This material deals directly with my handling of this matter on behalf of my client William Adolph and therefore is protected by attorney/client privilege. As it deals with my analysis, strategy, and mental impressions, it constitutes attorney's work product. Any other information contained in the file, which would be discovery exchanged through litigation, i.e., my responses to discovery demands, pleadings, depositions transcripts, and correspondence with Plaintiff's counsel's office, would be all be contained in the Cellino and Barnes file and therefore readily accessible to Plaintiff as the Cellino and Barnes file has already been provided.

(*Id.* at 5.) Through her cross-motion to compel compliance with the subpoenas (Dkt. No. 60), plaintiff asserts that "Ms. Banker in her motion to quash never denied that she may have relevant

5

factual information as to whether or not the defendants ever attempted to engage in good faith negotiations with the insurance carrier for the defendant on the underlying case." (Dkt. No. 60-1 at 1.) Plaintiff asserts further that she "drafted the subpoena in a manner that called for factual information and that was devoid of any request for attorney work product or attorney-client privileged information. The subpoena was designed to elicit non-privileged discoverable information essential to the proof required in the plaintiff's causes of action against the named defendants." (*Id.* at 4.) Plaintiff acknowledges that "[t]he real irony in requesting the information called for in the two subpoenas is that your declarant does not believe, based upon a review of the defendant's file and my conversations with my client and her representative, that there will be any telephone call logs, correspondence, notes and or emails between the defendants and either Ms. Banker or NYCM other than the June 21, 2012 and June 28, 2012 letters." (*Id.* at 6.) Plaintiff then seems to backtrack somewhat from the "any and all" demands on the faces of the subpoenas:

> The specific factual information the plaintiff is seeking from the non-party witnesses is limited in time and scope. The fact of whether there were any communications between the defendants and the non-party witnesses relating to settlement negotiations between the time the pre-trial conference was conducted in January 2012 and the commencement of the trial on July 9, 2012 does not involve providing privileged or attorney work product information. Whether any such communications took place, other than the previously referenced letters, is a vital piece of evidence that the plaintiff's proposed expert will rely on in formulating his or her opinion.

(*Id.* at 8.) Plaintiff emphasizes that she seeks only "the amount of reserve" set by NYCM and not any mental impressions related to it. (*Id.* at 8.) "The number NYCM placed as its reserve on the file in the underlying action is just a number and which is something NYCM is required to keep in the ordinary course of its business pursuant to government regulation. The disclosure of that amount maintained as the reserve requires no delivery of any mental impressions, conclusions or legal

6

theories regarding the underlying action." (Dkt. No. 68-2 at 2.) At the same time, plaintiff now places increased importance on obtaining telephone logs:

> It now appears from Ms. Banker's affidavit, See Doc. 67-1 par. 11 that Ms. Banker now claims that she had no further discussions regarding settlement after a May 30, 2012 pre-trial conference until "she was informed during the trial that a high/low agreement had been reached." If Ms. Banker had no knowledge of a high/low agreement, said agreement had to have been made between the defendants and an insurance carrier representative.
>
> Ms. Banker's affidavit regarding the high / low agreement makes it imperative that the plaintiff secured the telephone logs of NYCM regarding its communication with the defendants as there is nothing in the file provided by the defendants relating to the high/low agreement. Without those logs the plaintiff would be subject to a substantial hardship in proving certain aspects of her case.

(*Id.* at 3.)

There are other discovery-related issues pending as well. On January 3, 2020, defendants filed a motion to compel plaintiff's deposition. (Dkt. No. 62.) Both defendants' and plaintiff's motions also seek to modify the schedule for pretrial discovery. The Court suspended pretrial deadlines until the resolution of the pending motions. (Dkt. No. 61.).

### III. DISCUSSION
#### A. *Collateral Estoppel*

The Court first will examine the issue of collateral estoppel, because that issue potentially is dispositive of plaintiff's attempts to enforce the subpoenas. In state court, plaintiff sought an order containing two directives: 1) a directive permitting depositions of Banker and of NYCM Senior Casualty Examiner Christopher O'Meara ("O'Meara"); and 2) a directive requiring Banker to produce her litigation file and O'Meara to produce his claims file—effectively the entire file that NYCM would have for the state court case. (Dkt. No. 67-3 at 1–2.) Plaintiff sought the order before the state court case commenced, under the pre-suit discovery provision at N.Y. CPLR 3102(c). Since CPLR 3102(c) itself contains no procedural guidance, there is some indication in

7

state law that CPLR 3102(c) matters are special proceedings that operate under CPLR Article 4. *See Bumpus v. New York City Transit Auth.*, 883 N.Y.S.2d 99, 106 (App. Div. 2009) ("It has been recommended that a request for pre-action disclosure be sought by means of a special proceeding pursuant to CPLR article 4.") (citations omitted); David D. Siegel and Patrick M. Connors, N.Y. Practice § 352 (6th ed. and 2019 Supp.) ("Unfortunately, CPLR 3102(c) is devoid of any of the necessary mechanics for seeking preaction disclosure. The courts have filled the gap, recommending that the application should be made via a special proceeding.") (available in Westlaw). Treatment of pre-suit discovery as a special proceeding is important because, under state law, the final order that ends a special proceeding is considered a judgment. *See* CPLR 411 ("The court shall direct that a judgment be entered determining the rights of the parties to the special proceeding."). Having a judgment, in turn, implicates the federal statute requiring federal courts to give full faith and credit to the "records and judicial proceedings" of state courts. *See* 28 U.S.C. § 1738. Here, plaintiff's special proceeding in state court ended with an order denying her request "in all respects." (Dkt. No. 67-4 at 2.) The copy of the order in the docket bears two stamps of authenticity from the state court clerk and from the Erie County Clerk's Office. (*Id.* at 1, 2.) Plaintiff has not raised any question about the authenticity of the copy of the order that is in the docket. The Court thus accepts the copy in the docket as a final order and judgment from state court reciting that the parties were fully heard, that "due deliberation upon the matters" occurred (*id.* at 2), and that the requests for depositions and for production of files were fully denied.

The standard for collateral estoppel is well known. "Under collateral estoppel, or issue preclusion, the second suit is upon a different claim or cause of action. This doctrine's fundamental notion is that an issue of law or fact actually litigated and decided by a court of competent jurisdiction in a prior action may not be relitigated in a subsequent suit between the same parties or

8

their privies. Collateral estoppel saves parties and the courts from the waste and burden of relitigating stale issues, and, by discouraging inconsistent results, forwards public policy favoring the establishment of certainty in legal relations. There are exceptions to the use of collateral estoppel. For example, a court should decline to give preclusive effect to a prior judgment if there have been changes either in the applicable legal rules or the factual predicates essential to that prior judgment. In addition, where pure questions of law—unmixed with any particular set of facts—are presented to a court, the interests of finality and judicial economy may be outweighed by other substantive policies." *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 718–19 (2d Cir. 1993) (internal quotation marks and citations omitted). "Collateral estoppel generally applies if: (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was a full and fair opportunity for litigation in the prior proceeding, and (4) the issues previously litigated were necessary to support a valid and final judgment on the merits." *Lord v. Int'l Marine Ins. Servs.*, 420 F. App'x 40, 41 (2d Cir. 2011) (summary order) (internal quotation marks and citations omitted). All of the elements for collateral estoppel are present here. In the pre-suit special proceeding, plaintiff wanted Banker to appear for a deposition and to produce her litigation file; and wanted O'Meara to appear for a deposition and to produce his claims file. (Dkt. No. 67-3 at 1.) Here, the subpoena served on Banker required her to appear at a specific date and time for a deposition and to bring her entire litigation file with her. (Dkt. No. 67-2 at 1.) The subpoena served on NYCM similarly required O'Meara—he is not mentioned by name, but he almost certainly would have been NYCM's representative under Rule 30(b)(6)—to appear at a specific date and time for a deposition and to bring NYCM's entire claims file with him. (Dkt. No. 63-2 at 2.) The parties in both proceedings are identical and litigated the issues fully in state court. The issues in state court led to a final order and judgment, and the final order and judgment came

9

about solely to address the issues about depositions and file production. Plaintiff has not pointed to any changes in state legal rules since the final order and judgment. Plaintiff also has not demonstrated any changes in factual circumstances. In both state court and here, plaintiff stated explicitly that she wants depositions and file production to explore "the failure of Mr. D'Amato to secure a settlement when a significant offer had been made and where the plaintiff was prepared to settle for what appeared to be a very reasonable amount given the injury sustained, the amount already offered, and the coverage available." (Dkt. No. 67-3 at 4; *see also* Dkt. No. 60-1 at 4 ("The central issue in the plaintiff's case [here in federal court] is whether or not the defendants reasonably attempted to negotiate a settlement on their client's behalf or acted in a manner that was designed to further their own interests at the expense of the plaintiff.").) *Cf. Application of Am. Tobacco Co.*, 880 F.2d 1520, 1527 (2d Cir. 1989) ("These [collateral estoppel] principles have been applied in federal court to bar an attack on a subpoena, where a New York state court had previously denied a motion to quash an identical subpoena."); *see also Temple of Lost Sheep Inc. v. Abrams*, 930 F.2d 178, 183 (2d Cir. 1991) (applying collateral estoppel from a state-court judgment to prohibit federal litigation under 42 U.S.C. § 1983). Under these circumstances, this Court is obligated to honor the final order and judgment from state court. Plaintiff is collaterally estopped from seeking depositions of Banker, O'Meara, and any other Rule 30(b)(6) representative of NYCM. Plaintiff further is collaterally estopped from obtaining Banker's litigation file or NYCM's claims file.

**B.     *Modifying the Subpoenas***

Although plaintiff is collaterally estopped from the depositions and file production described above, one more issue requires some attention. Even when courts find problems with requests in subpoenas, they will modify the subpoenas before quashing them altogether if modifications can correct the problems. *See, e.g., Cooper v. Hill*, No. 12-CV-1227S, 2016 WL 7366976, at *2 (W.D.N.Y.

10

Dec. 20, 2016); *Gambino v. Payne*, No. 12CV824A, 2015 WL 866811, at *2 (W.D.N.Y. Mar. 2, 2015) ("Modification is preferred to outright quashing a subpoena.") (citation omitted); *see also, e.g., Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004) ("Generally, modification of a subpoena is preferable to quashing it outright.") (citations omitted); *Linder v. Nat'l Sec. Agency*, 94 F.3d 693, 698 (D.C. Cir. 1996) (noting that "a modification of a subpoena is generally preferred to outright quashing"). Here, plaintiff has pointed to two narrow paths to limited discovery that would not be subject to collateral estoppel. First, plaintiff has stated in her papers that "one of the chief objectives of the subpoenas served on Ms. Banker and NYCM was to ascertain whether or not there were any communications between the defendants and either Ms. Banker or NYCM between late May 2012 and the commencement of the trial on July 9, 2012 other than the above referenced letters." (Dkt. No. 60-1 at 6.) The occurrence of communications from defendants to either Banker or NYCM, in itself, would be an objective underlying fact separate from documents that would be protected by work-product privilege. *See ECDC Envtl. v. New York Marine & Gen. Ins. Co.*, No. 96CIV.6033(BSJ)(HBP), 1998 WL 614478, at *16 (S.D.N.Y. June 4, 1998) ("However, because the work product privilege does not protect the facts in that document (the privilege protects documents, not facts), the party seeking those facts may obtain them through other means of discovery, such as through depositions and interrogatories."); *see also Hickman v. Taylor*, 329 U.S. 495, 511 (1947) ("Where relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had."). The basic occurrence of communications thus is discoverable.

Second, plaintiff has clarified that she "is not interested in the mental impressions of either attorneys or the insurance company as to how NYCM arrived at the reserve but only the amount of reserve." (*Id.* at 8.) Case law regarding disclosure of reserve information is somewhat divided. In

11

the context of bad-faith litigation between an insured and an insurance company, reserve information is discoverable so long as it reflects ordinary business judgments and not legal advice made in contemplation of litigation. *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 284 F.R.D. 132, 139 (S.D.N.Y. 2012); *Champion Int'l Corp. v. Liberty Mut. Ins. Co.*, 128 F.R.D. 608, 612 (S.D.N.Y. 1989); *see also Pete Rinaldi's Fast Foods, Inc. v. Great Am. Ins. Cos.*, 123 F.R.D. 198, 202 (M.D.N.C. 1988) ("An insurance company cannot reasonably argue that the entirety of its claims files are accumulated in anticipation of litigation when it has a duty to investigate, evaluate and make a decision with respect to claims made on it by its insured."). That said, courts cannot overlook the issue of relevance. "Defendant's assessment or its underwriter's assessment or its counsel's assessment of exposure to liability in this or prior cases has nothing to do with whether here there is liability. Furthermore, to allow evidence of the amount of reserves set aside for any particular incident would get this trial into mini-litigations over what was in the minds of the persons who set the reserve to uncover why each particular reserve was set (which would likely have depended on various factors besides an assessment of potential liability)." *Sundance Cruises Corp. v. Am. Bureau of Shipping*, No. 87 CIV. 0819 (WK), 1992 WL 75097, at *1 (S.D.N.Y. Mar. 31, 1992), *cited by Ice Cube Bldg., LLC v. Scottsdale Ins. Co.*, No. 3:17-CV-00973 (KAD), 2019 WL 4643609, at *2 (D. Conn. Apr. 8, 2019) ("The issue of reserves and the setting of reserves is beyond the scope of Rule 26 in this coverage dispute."). If the relevance of a reserve amount can be questionable in bad-faith coverage disputes then it becomes even more attenuated in a dispute over legal malpractice. This case is not about bad faith by NYCM; the case is not about whether NYCM set an initial internal number that it may or may not have modified in response to plaintiff's settlement offer. This case is about whether defendants conveyed plaintiff's settlement offer at all, and whether any failure to do so rises to the

12

level of legal malpractice. Consequently, even if the basic fact of the reserve number could escape collateral estoppel, the Court finds that reserve information here is not relevant.

Accordingly, Banker's and NYCM's motions to quash are granted with one exception. Within 30 days of this Decision and Order, Banker and an appropriate representative of NYCM each will serve affidavits on plaintiff answering whether they received any communication of any kind from defendants, between January 27 and July 9, 2012, conveying any settlement offers from plaintiff.

### C. New Scheduling

Having addressed the principal issue of plaintiff's subpoenas, the Court finds that any remaining issues in the pending motions pertain to scheduling. The Court thus will set new deadlines as follows, mindful that ongoing public-health events and the District's General Order Regarding Court Operations[2] might hamper discovery-related logistics.

On or before May 8, 2020, the parties will respond to any discovery demands that they have served on each other up to this point and that remain pending.

On or before July 31, 2020, all fact discovery including all depositions will conclude.

On or before August 31, 2020, the parties will identify any experts and provide written reports as required under Rule 26(a)(2).

On or before October 30, 2020, all expert discovery will conclude.

---

[2] *Available at* https://www.nywd.uscourts.gov/sites/nywd/files/Court%20Operations%20Under%20COVID-19_signed.pdf.

**IV. CONCLUSION**

For all of the foregoing reasons, the Court adjudicates the pending motions as follows:

- Plaintiff's motion to compel and to amend the scheduling order (Dkt. No. 60) is denied except to amend the schedule as stated above.

- Defendants' motion to compel plaintiff's deposition and to amend the scheduling order (Dkt. No. 62) is granted in part to set a new schedule that includes a deadline for all depositions. The motion is denied to the extent that it seeks any other relief.

- NYCM's motion to quash (Dkt. No. 63) is granted with the exception of the affidavit described above.

- Banker's motion to quash (Dkt. No. 67) is granted with the exception of the affidavit described above.

SO ORDERED.

__/s Hugh B. Scott_____
Hon. Hugh B. Scott
United States Magistrate Judge

DATED: March 30, 2020