UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CHANDY BOUNKHOUN,

                    Plaintiff,                    1:15-CV-631-RJA-MJR

                                                  REPORT AND RECOMMENDATION

        -v-

STEPHEN E. BARNES, et al.,

                    Defendants.
_____


## <u>INTRODUCTION</u>

        This case has been referred to the undersigned pursuant to Section 636(b)(1) of

Title 28 of the United States Code, by the Honorable Richard J. Arcara, to hear and report

on dispositive motions for consideration by the District Court. Before the Court are Plaintiff

Chandy Bounkhoun's motion for summary judgment (Dkt. No. 97) and Defendants Steven

E. Barnes, Esq., Ross Cellino, Esq., Christopher D. D'Amato, Esq., and Cellino & Barnes,

P.C.'s motion for summary judgment (Dkt. No. 95), each brought pursuant to Rule 56 of

the Federal Rules of Civil Procedure. For the following reasons, it is recommended that

Defendants' motion for summary judgment be granted and Plaintiff's motion for summary

judgment be denied.

## <u>PROCEDURAL HISTORY</u>

        The Court assumes familiarity among the parties with the case and its procedural

history. Therefore, only the relevant history is outlined here. In 2015, Plaintiff Bounkhoun

brought this diversity action against Defendants – her former attorneys and their law firm

– based on allegations that they committed legal malpractice and violated New York Judiciary Law § 487 while representing her in a personal injury action. (Dkt. No. 1). She alleged that Defendants undermined a settlement in that case to pursue a verdict that would bring higher attorney fees, without keeping Plaintiff informed of their decisions. (*Id*.).

This case was previously referred to Hon. Hugh B. Scott to handle pretrial matters. (Dkt. No. 12). On April 11, 2017, Judge Scott issued a Report and Recommendations ("R&R") addressing a motion to dismiss and motion for sanctions brought by Defendants.[1] (Dkt. Nos. 10; 11). After reviewing Plaintiff's objections to the R&R, Judge Arcara issued a Decision and Order on April 17, 2018 in which he denied Defendants' motion to dismiss and imposed Rule 11 sanctions on Plaintiff's counsel. (Dkt. No. 26). The matter was re-referred to Judge Scott for further proceedings.

On May 1, 2018, Plaintiff filed her second amended complaint, which is now the operative pleading. (Dkt. No. 28). Plaintiff's two remaining claims of legal malpractice and violation of New York Judiciary Law § 487 proceeded through discovery. On March 4, 2021, this matter was reassigned to the undersigned. (Dkt. No. 85).[2]

---

[1] As Judge Scott's R&R explained, Plaintiff's complaint alleged causes of action for conversion, conversion conspiracy, misrepresentation, violation of New York Judiciary Law § 487, legal malpractice, and violations of New York General Business Law §§ 349 and 350. (Dkt. No. 20, pgs. 1-2). Defendants asked Plaintiff to withdraw all claims except her legal malpractice claim on the basis that the other claims were frivolous. (*Id*.). When Plaintiff refused, Defendants filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) and a motion for sanctions under Fed. R. Civ. P. 11. (*Id*.). Plaintiff withdrew each of the challenged causes of action except for her Judiciary Law § 487 claim after Defendants filed the motion. (*Id*.). Judge Scott's R&R addressed the legal sufficiency of the § 487 claim, and ultimately recommended granting the motion to dismiss and granting the motion for sanctions in part. (*Id*., pg. 29).

[2] By Text Order dated September 24, 2021, Judge Arcara made a dispositive referral of this case to the undersigned. (Dkt. No. 101).

On September 1, 2021, Defendants filed a motion for summary judgment on both of Plaintiff's claims. (Dkt. No. 95). On the same date, Plaintiff also filed a motion for summary judgment on those claims. (Dkt. No. 97). Each party filed a response to the opposing party's motion, (Dkt. Nos. 98; 100), and filed reply memoranda (Dkt. Nos. 102; 103). This Court heard oral argument on each of the motions on October 20, 2021. At that time, the Court considered the matter submitted for report and recommendation.

### **FACTS**[3]

Plaintiff Chandy Bounkhoun claims that Defendants committed legal malpractice when negotiating a settlement in an underlying personal injury case. That case arose after Bounkhoun was injured by a rock discharged from a lawnmower operated by Bounkhoun's landlord. (Dkt. No. 97-1, ¶ 1). The injury caused Bounkhoun to lose sight in her left eye. (*Id.*). Bounkhoun entered into a retainer agreement with Defendants for the purpose of representing her in that action. (*Id.*). Defendant Christopher D. D'Amato was an attorney at the law firm of Cellino & Barnes, P.C., which was headquartered in Buffalo, New York and run by Defendants Ross M. Cellino, Esq. and Steven E. Barnes, Esq. (Dkt. No. 95-1, ¶ 1).

Plaintiff Bounkhoun is Laotian and does not speak English. (Dkt. Nos. 95-1, ¶¶ 3, 6; 97-1, ¶ 2). During the course of the personal injury litigation, Daravanh "Vicky" Thitakham (a/k/a Daravanh Noraseng), who is married to Bounkhoun's brother, became involved as an interpreter between Cellino & Barnes and Bounkhoun. (Dkt. Nos. 95-1, ¶ 6; 97-1, ¶ 2). Thitakham was given permission by Bounkhoun to act as an interpreter.

---

[3] The facts described herein are taken from the pleadings, motion papers, statements of undisputed facts, and exhibits filed in this lawsuit. When citing a proposed fact within either party's statement of material facts (Dkt. Nos. 95-1; 97-1), the Court has confirmed that opposing party's responding statement either admits the fact or fails to specifically controvert it with evidence. *See* W.D.N.Y. L.R. Civ. P. 56(a).

(Dkt. No. 95-1, ¶ 8). All communications related to settlement discussions on Bounkhoun's case were made between Thitakham and D'Amato. (Dkt. No. 97-1, ¶ 2). Some settlement discussions between Thitakham and D'Amato are reflected in email exchanges. (Dkt. No. 97-1, ¶ 3).

During the course of the case, it became known that Bounkhoun owed money to several entities and individuals, including around $11,000 owed to the Erie County Department of Social Services and around $20,000 owed to her brother. (Dkt. No. 95-1, ¶ 11). Bounkhoun's brother indicated that he expected to be repaid from the proceeds of Bounkhoun's lawsuit. (*Id*.). Bounkhoun also intended to compensate Thitakham if she won at trial. (Dkt. No. 95-1, ¶ 8).

As the underlying case proceeded, settlement discussions began. (Dkt. No. 95-1, ¶ 12). The case was assigned to New York State Supreme Court Justice Frederick J. Marshall. (Dkt. No. 95-1, ¶ 12; 97-1, ¶ 5). Judge Marshall's confidential law clerk, Amy Ziegler, held settlement conferences with counsel for the parties. (*Id*.). Once Ziegler became involved in the case, she conducted settlement negotiations between the parties. (Dkt. No. 95-1, ¶ 17). Many attorneys negotiate through a court clerk in this manner, including other attorneys within Cellino & Barnes. (*Id*.). Bounkhoun's expert witness, Anthony LaDuca, Esq., and Defendants' expert witness, John C. Trimble, Esq., agreed that negotiating through a facilitator such as Ziegler is not unusual. (*Id*.). Attorneys frequently utilize court facilitators and/or mediators in such a manner, and this does not constitute a departure from the accepted standard of care. (*Id*.). Bounkhoun's expert testified that confidential law clerks can be skilled at mediating, and that he has used court mediators to resolve cases. (*Id*.).

Attorneys at the Cellino & Barnes law firm were required to speak with Steven Barnes prior to making demands or settling cases. (Dkt. No. 95-1, ¶ 13). After conferring with Barnes, D'Amato made a demand of $1 million dollars on Bounkhoun's behalf. (Dkt. No. 95-1, ¶ 14). In response Hilary Banker, Esq., who represented the underlying defendant, made an initial offer of $50,000. (Dkt. No. 95-1, ¶ 15). After receiving the $50,000 offer, D'Amato spoke with Ziegler in an attempt to secure a higher amount. (Dkt. No. 95-1, ¶ 16).

Early discussions between D'Amato and Ziegler concerned a potential target settlement figure of $100,000. (Dkt. No. 95-1, ¶ 18). D'Amato emailed Thitakham to break down how $100,000 would be allocated to the various debts if Bounkhoun's case settled for that amount. (Dkt. No. 95-1, ¶ 19). Thitakham stated that she would speak with the family about accepting $100,000 for settlement if that offer could be obtained. (*Id.*). D'Amato continued to speak with Thitakham concerning a potential $100,000 offer. (Dkt. No. 95-1, ¶ 20). He advised her of the pros and cons of going to trial rather than accepting a settlement offer; including that Bounkhoun could potentially receive nothing at trial, or that she could obtain a high verdict. (*Id.*).

Around May 30, 2012, the underlying defendant did offer $100,000 to settle the personal injury case. (Dkt. No. 95-1, ¶ 21). D'Amato spoke with Thitakham about the offer. (*Id.*). On June 4, 2012, D'Amato conveyed the $100,000 offer to settle to Barnes via email, stating that given the liability issues in the case that amount was a good settlement. (Dkt. No. 97-1, ¶ 9). Thitakham ultimately advised D'Amato that Bounkhoun and her family did not believe $100,000 was enough money to resolve the case. (Dkt. No. 95-1, ¶ 22). Their decision was made because Bounkhoun had large outstanding debts that would need to

be repaid from the settlement proceeds. (Dkt. No. 95-1, ¶ 23). Bounkhoun and her family felt that the amount of money left for Bounkhoun from a $100,000 settlement after repayment of debts was insufficient. (*Id*.).

Thitakham then asked if D'Amato could obtain $150,000 for settlement of the case. (Dkt. No. 95-1, ¶ 24). D'Amato stated he would talk to the judge to see if he could obtain a higher offer. (*Id*.). Bounkhoun's expert testified that this tactic does not constitute malpractice. (*Id*.). D'Amato discussed this with Barnes and neither of them believed that $150,000 was outside a reasonable settlement range for the case. (Dkt. No. 95-1, ¶ 25). Bounkhoun's expert also viewed this amount as reasonable, stating that the case was "high risk, high reward." (*Id*.). D'Amato testified that he then reached out to Ziegler to discuss obtaining an offer of $150,000 from the underlying defendant. (Dkt. No. 95-1, ¶ 26). He advised Ziegler that he did not need a much higher offer to settle the case. (*Id*.). Bounkhoun disputes that there is any evidence in the record, apart from D'Amato's testimony, that D'Amato relayed the $150,000 settlement objective to Ziegler or that he had contact with Ziegler other than at pretrial conferences and by communications on November 15, 2011 and June 5, 2012. (Dkt. Nos. 100-1, ¶¶ 8-10, 15; 100-2).

Ziegler never got back to D'Amato concerning any increase in the underlying defendant's offer. (Dkt. No. 95-1, ¶ 27). When D'Amato did not hear back from Ziegler, he sent a "bad faith" letter dated June 21, 2012 to the underlying defendant's insurance carrier, New York Central Mutual Insurance. (Dkt. Nos. 95-1, ¶ 28; 97-1, ¶ 6). Bad faith letters may be sent by attorneys for different purposes; one reason being to get the attention of a higher-level settlement decision maker. (Dkt. No. 95-1, ¶ 28). Bounkhoun's

expert testified that this is an acceptable strategy and that sending a bad faith letter is not a deviation from the standard of care. (*Id*.).

By letter dated June 28, 2021, Christopher O'Meara, a representative of New York Central Mutual, responded to D'Amato's letter without increasing the prior settlement offer. (Dkt. Nos. 95-1, ¶ 29; 97-1, ¶ 12). After receipt, D'Amato contacted Ziegler about the letter. (Dkt. No. 95-1, ¶ 29). However, D'Amato did not provide Ziegler with a copy of O'Meara's response to the bad faith letter. (Dkt. No. 97-1, ¶ 13). D'Amato testified that he "told Amy Ziegler what [the response letter] said in sum and substance." (Dkt. No. 95-1, ¶ 29). D'Amato felt the response was insincere and did not indicate that the insurer was willing to continue engaging in negotiations. (Dkt. No. 95-1, ¶¶ 29, 32).

D'Amato explained that he did not negotiate directly with opposing counsel because Ziegler was involved as a mediator. (Dkt. No. 95-1, ¶ 32). Defendants' expert opined that returning to the facilitator to continue negotiations, as D'Amato did, or responding directly to the other party would have been acceptable courses of conduct. (*Id*.). D'Amato reduced Bounkhoun's $1 million dollar demand to $750,000, but the underlying defendant did not increase its offer of $100,000. (Dkt. No. 95-1, ¶ 33).

No one else at Cellino & Barnes reviewed the response to the bad faith letter or had a conversation with D'Amato about it. (Dkt. No. 95-1, ¶ 30). This was consistent with practice and policy of the law firm. (Dkt. No. 95-1, ¶ 30-31). Bounkhoun and her representative were unaware that there had been an exchange of letters between D'Amato and O'Meara relating to settlement. (Dkt. No. 97-1, ¶ 20). D'Amato could not admit or deny whether the letters of June 21, 2021 and June 28, 2012 were ever provided to Bounkhoun. (Dkt. No. 97-1, ¶ 22). Not all attorneys opt to send a copy of such a letter

to their clients. (Dkt. No. 95-1, ¶ 28). The only written communication D'Amato sent to the insurance adjuster between January 27, 2012 and July 9, 2012 was the bad faith letter. (Dkt. No. 97-1, ¶ 23).

Bounkhoun's expert opined that from the language of the response letter he believed the insurer would "come up more" with its offer after further negotiations. (Dkt. No. 95-14; pgs. 100-02). He testified that D'Amato's discussion with Ziegler about the response letter constituted an intent to deceive.[4] (Dkt. No. 95-1, ¶ 38). Plaintiff's expert clarified that, in his opinion, D'Amato was deceiving himself and Ziegler, rather than Bounkhoun, in that conversation. (*Id*.). Bounkhoun testified that she does not believe Cellino & Barnes lied to her, tricked her, or deceived her while handling her case. (Dkt. No. 95-1, ¶ 39). Thitakham does not have any information that Defendants misled or lied to Bounkhoun or her family. (*Id*.).

The underlying defendant never offered more than $100,000 to settle the case. (Dkt. No. 95-1, ¶ 34). Bounkhoun was unwilling to accept the $100,000 settlement offer, so the case moved forward to trial. (Dkt. No. 95-1, ¶ 33).

During trial, a "high-low agreement" was put on the record. (Dkt. No. 95-1, ¶ 35). Pursuant to that agreement, Bounkhoun would receive $25,000 if her claim was not accepted by the jury (*Id*.). If Bounkhoun prevailed on the claim, she could not recover damages in excess of $750,000. (*Id*.). The parties dispute whether it was D'Amato, the underlying defendant, or Ziegler who first proposed the high-low agreement. (Dkt. No. 95-

---

[4] Bounkhoun also disputes that D'Amato had contact with Ziegler about the responsive letter. (Dkt. No. 100, ¶ 9-10). To support this assertion, she refers to a communications log maintained by Defendants that does not reflect an attorney notation for any telephone calls to Ziegler after June 5, 2012. (Dkt. No. 100-2).

1, ¶ 35; 97-1, ¶ 10). D'Amato explained the high-low agreement to Bounkhoun, through Thitakham, on two instances, and he was confident they understood and consented to the agreement. (*Id*.). At the time the high-low agreement was made, Cellino & Barnes had incurred litigation expenses of $13,531.81.[5] (Dkt. No. 97-1, ¶ 16). The combined amount of the litigation expenses and Department of Social Services lien exceeded the sum of the low end of the high-low agreement. (Dkt. No. 97-1, ¶ 17). The placement of the agreement on the record guaranteed that a sum of money would be available to pay off litigation disbursements regardless of the outcome of the trial. (Dkt. No. 97-1, ¶ 18).

At trial, Thitakham advised D'Amato of some deficiencies with the court-appointed interpreter. (Dkt. No. 95-1, ¶ 36). D'Amato attempted to secure a different interpreter for the trial. (*Id*.). The new interpreter came to trial, but the judge selected the first interpreter, who had been used at depositions, despite D'Amato's request to use the new individual. (*Id*.).

The jury returned a verdict against Bounkhoun and in favor of the underlying defendant. (Dkt. No. 95-1, ¶ 37). Pursuant to the high-low agreement, Bounkhoun received an award of $25,000 minus costs, fees, and liens, for a net payout of $7,256.30. (Dkt. Nos. 15, ¶ 21; 96, pg. 4).

## **DISCUSSION**

### *Rule 56 Standard*

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is to be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56. A genuine issue of

---

[5] Defendants submit that Cellino & Barnes had a policy of forgiving litigation expenses in the event of a "no cause" verdict. (Dkt. No. 99, ¶ 16).

material fact exists "where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008). "[V]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier [of fact] could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Bay v. Times Mirror Magazine, Inc.*, 936 F.2d 112, 116 (2d Cir. 1991). When a movant has met this burden, the burden shifts to the non-movant to bring forth evidence establishing the existence of an issue of material fact. *Linares v. McLaughlin*, 423 Fed. Appx. 84, 86 (2d Cir. 2011).

In evaluating a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party, and it is the burden of the moving party to demonstrate the absence of any material genuinely in dispute. *Hathaway v. Coughlin*, 841 F.2d 48, 50 (2d Cir. 1988). Importantly, a court must not "weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) (citation omitted). However, a party cannot defeat a motion for summary judgment by relying upon conclusory statements or mere allegations unsupported by facts. *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). The nonmoving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

### <u>Motions for Summary Judgment</u>

Each party moves for summary judgment on Plaintiff's remaining claims of legal malpractice and violation of New York Judiciary Law § 487. For the reasons that follow, the Court finds that Defendants are entitled to summary judgment in their favor on both

of Plaintiff's claims. Thus, it is recommended that Defendants' motion for summary judgment be granted in its entirety and Plaintiff's motion for summary judgment be denied in its entirety.

1.  *Legal Malpractice Claim*

To recover for legal malpractice under New York law, a plaintiff must establish: (1) that the attorney failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession, and (2) that the breach of this duty was the proximate cause of the plaintiff's actual and ascertainable damages. *Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer*, 8 N.Y.3d 438, 442 (N.Y. 2007). The second element is often referred to as the "but for" rule. *Davis v. Klein*, 88 N.Y.2d 1008, 1009-10 (N.Y. 1996). Plaintiff must show that she would have succeeded on the merits in the underlying action, or would not have incurred any damages, but for the attorney's negligence. *Id*. Expert testimony is ordinarily required in any legal malpractice case concerning the issue of defendant's departure from acceptable professional standards. *Middle Mkt. Fin. Corp. v. D'Orazio*, 96-CV-8138, 2002 U.S. Dist. LEXIS 17817, at *21 (S.D.N.Y. Sept. 18, 2002); *see e.g., Zeller v. Copps*, 294 A.D.2d 683, 684 (3d Dep't 2002) ("To meet [her summary judgment] burden in a legal malpractice action, a plaintiff generally must present expert opinion evidence on the attorney's duty of care.").[6]

Plaintiff makes several allegations about conduct that she believes constituted malpractice on the part of her attorney, Christopher D'Amato, and the law firm who

---

[6] On Plaintiff's motion for summary judgment, Defendants initially argue that the motion should be denied based on Plaintiff's failure to offer an expert opinion. Although Plaintiff previously produced Anthony LaDuca, Esq. for deposition and provided his expert report, Plaintiff has not submitted his opinion in support of her summary judgment motion. Plaintiff responds that the expert will be produced at trial. For the reasons that follow, it is clear that Defendant is entitled to summary judgment based on the opinions of Plaintiff's expert, LaDuca, and Defendants' expert, Trimble, and Plaintiff has submitted no other expert witnesses to show otherwise.

represented her, Cellino & Barnes, P.C. Those include failures in pursuing the settlement of Plaintiff's claim; utilizing the court law clerk to negotiate a settlement on behalf of Plaintiff; failing to provide Plaintiff with copies of the bad faith letter and response from the insurance carrier; failing to manage client expectations with respect to reasonableness of Plaintiff's $150,000 settlement request; failing to continue to negotiate to reach a settlement offer of $150,000 after D'Amato received a response to the bad faith letter; use of an allegedly improper translator at trial; and entering into a high/low agreement at trial. Defendants argue that each allegation of malpractice has been shown as a reasonable course of action that Defendants may have taken under the circumstances and that none are sufficient to support a finding of malpractice.

Mere errors of judgment do not constitute legal malpractice. *Rosner v. Paley*, 65 N.Y.2d 736, 738 (N.Y. 1985). Nor does selecting among reasonable alternative courses of action constitute malpractice. *Brook Plaza Ophthalmology Assoc., P.C. v. Fink, Weinberg, Fredman, Berman & Lowell*, 173 A.D.2d 170, 171 (1st Dep't 1991). Speculating that "a different strategy might have ultimately led to a more beneficial result for plaintiff" is insufficient to make a showing of legal malpractice. *M&R Ginsberg, LLC v. Segel, Goldman, Mazzotta & Siegel, P.C.*, 121 A.D.3d 1354, 1355 (3d Dep't 2014). Here, despite Plaintiff's claims, the evidence shows that Defendants selected from reasonable options when handling Plaintiff's case and did not breach their duty of professional care.

Overall, the undisputed evidence demonstrates that Defendants sought settlement of the case in accordance with Plaintiff's objectives. The record reflects D'Amato's consistent engagement in settlement conferences and negotiations. After the underlying defendant's initial offer of $50,000, D'Amato was able to negotiate that offer upwards to

$100,000. D'Amato had multiple discussions with Plaintiff, through her interpreter, about a potential settlement target and explained how a settlement figure would be allocated. He also explained the pros and cons of accepting a settlement versus proceeding to trial. When Plaintiff rejected the $100,000 offer, D'Amato continued to negotiate through the court mediator, and by sending a bad faith letter to the insurer, in order to achieve the $150,000 settlement figure sought by Plaintiff.

More specifically, there is no evidence of malpractice in D'Amato's decision to pursue settlement negotiations through the court and law clerk, as opposed to communicating directly with opposing counsel. Both expert witnesses in this case agreed that using a court facilitator was a reasonable course of action. Plaintiff argues that D'Amato "delegated and abrogated" his duties as an attorney to court personnel by relying on the law clerk, Amy Ziegler, for settlement negotiations. Plaintiff provides no caselaw to support this position. Nor does she cite to any evidence demonstrating that D'Amato relied on Ziegler improperly or delegated any of his professional duties to her during settlement negotiations. In fact, the undisputed evidence shows that Ziegler's conducting of pretrial settlement conferences and acting as a mediator for settlement negotiations was not unusual. It is uncontested that attorneys frequently utilize court clerks as facilitators or mediators, and that an attorney's reliance on a court mediator in this context does not constitute a departure from the accepted standard of care. Plaintiff's expert witness agreed that law clerks can be skilled at mediating and may be used to resolve cases. He further testified that utilizing court personnel, as the record shows D'Amato did,

would constitute an attempt at settlement on a client's behalf. Indeed, D'Amato's negotiations through Ziegler produced a settlement offer of $100,000.[7]

Following Plaintiff's rejection of the $100,000 settlement offer, D'Amato again selected among reasonable options and chose to send a "bad faith" letter to the insurance company. Such a letter can be used to get the attention of a higher-level decision maker. Both expert witnesses agreed that sending such a letter was a reasonable effort to ramp up negotiations. After receiving the insurer's response, D'Amato contacted Ziegler and conveyed the substance of the letter to her. He did not reply directly to the insurance representative, and instead chose to negotiate through Ziegler. Plaintiff's expert opined that this was an acceptable strategy. Plaintiff also alleges that failing to send a copy of the letter or the response to Plaintiff constitutes malpractice, but she provides no authority for that proposition. In fact, Plaintiff's expert opined that not all attorneys would opt to send a copy of such letters to their clients. Plaintiff's expert was also clear that because no increased offer was made by the insurer in response, there was no failure on D'Amato's part to communicate to Plaintiff the lack of change in negotiations.

Similarly, Plaintiff fails to support her allegation that D'Amato deceived Ziegler by depicting the response letter as an indicator that the insurer did not sincerely intend to engage in further negotiations. Plaintiff's expert did opine about the sincerity and meaning of the letter, stating that he believed the letter suggested there was room for the parties

---

[7] Plaintiff also makes speculative claims that the defense is attempting to use Ziegler's involvement to shield them from liability. They state that a "distinct possibility exists that Mr. D'Amato's superior directed him to place the Plaintiff's case in a litigation posture, solely for the benefit of defendant's law firm [...]." (Dkt. No. 97-13, pg. 4). These assertions are wholly unsupported by the record before the Court and Plaintiff has made little effort to substantiate them. The Court also rejects Plaintiff's allegation that D'Amato deceived her into believing that he was attempting to negotiate the settlement of her claim while acting in his own interest, or his law firm's interest. As discussed below in regard to Plaintiff's Judiciary Law § 487 claim, this allegation is belied by the testimony of Plaintiff and her interpreter to the effect that neither believed D'Amato had deceived them.

to negotiate. This opinion contrasts with D'Amato's impression that the insurer's failure to increase the offer showed that the company did not genuinely intend to negotiate further. Regardless of the varied interpretation of intent behind the insurer's letter, the testimonial evidence shows that D'Amato did attempt to obtain a larger settlement offer, as requested by Plaintiff, and communicated with Ziegler about the letter in order to continue negotiations.

Within this argument, Plaintiff also attempts to refute D'Amato's testimony that he contacted Ziegler about the letter. Plaintiff cites to a communication log maintained by Defendants which does not indicate a telephone call to Ziegler during that time period. However, the absence of a file note does not impugn D'Amato's clear testimony about his actions. Plaintiff fails to offer testimony of Ziegler, or any other percipient witness, to rebut D'Amato testimony about the instances or substance of his communications with Ziegler. In not doing so, she has failed to carry her burden of providing specific evidence to demonstrate a genuine dispute about the facts relevant to these communications. Moreover, even if D'Amato had not contacted Ziegler after the responsive letter, there is no evidence that D'Amato ignored any attempts at negotiations from the insurer (through Ziegler or otherwise), nor that he received, or failed to relay to Plaintiff, any additional settlement offers. Thus, Plaintiff has failed to raise a triable issue of fact on this point.

Plaintiff's contention that Defendants did not manage her expectations when she requested a $150,000 settlement also fails to serve as a basis for malpractice claims. Both D'Amato and Barnes (who approved all settlements for the firm) believed that the $150,000 request was within a reasonable settlement range for the case. D'Amato attempted to obtain that amount and consistently communicated with Plaintiff, through

her interpreter, about settlement possibilities. The undisputed facts show that Plaintiff refused the $100,000 because it was not sufficient to settle personal debts she had incurred unrelated to the case. Plaintiff's motivation to seek a higher settlement amount directed Defendants' actions and it cannot be said that such actions were unreasonable.

Further, Plaintiff's allegations of an improper interpreter serving at trial does not evince malpractice on the part of Defendants. When concerns were raised about the interpreter, D'Amato secured an interpreter that Plaintiff approved of and made a request to the trial court to make a substitution. The trial judge decided to continue using the interpreter who had previously been used for depositions in the case. Plaintiff provides no authority, nor does she offer sound reasoning, to hold Defendants liable for a decision of the trial court judge.

Lastly, Defendants' role in entering into the high-low agreement does not constitute malpractice. Although there is a factual dispute about which party first proposed the high-low agreement, the agreement was entered into in open court with Plaintiff's express consent. The agreement was protective of Plaintiff in a case that Defendants testified was high-risk because of liability concerns. Plaintiff's expert acknowledged that Plaintiff received a benefit from the agreement in that she was guaranteed $25,000 even though the jury returned a complete defense verdict. The fact that the high-low agreement was reached additionally indicates that D'Amato continued negotiations and discussions about case resolution up to and including trial.

Even if Plaintiff's various allegations could be viewed as demonstrating Defendants' failure to exercise ordinary reasonable skill and knowledge, there is no proof that "but for" the alleged malpractice Plaintiff would have obtained the $150,000

settlement she desired. If alleging malpractice due to negligent settlement negotiations, a plaintiff must prove that the higher settlement would actually have been obtained "but for" defendant's conduct. *See Katz v. Essner*, 136 A.D.3d 575, 576 (1st Dep't 2016). Here, the undisputed facts show that Plaintiff rejected the underlying defendant's offer of $100,000 and directed D'Amato to attempt to obtain a settlement amount of $150,000. This amount was communicated to Ziegler as the mediator. D'Amato also sent a bad faith letter directly to the carrier in an attempt to obtain an increased offer. The record is clear that the underlying defendant never made such an offer, and thus, D'Amato could not have settled the case on the terms Plaintiff requested. *See Santiago v. Fellows, Epstein & Hymowitz, P.C.*, 66 A.D.3d 758, 759 (2d Dep't 2009) (finding no legal malpractice where plaintiff asked attorney to settle case for a higher amount of money than was offered by the underlying defendant).

Based on the record, the Court concludes that there are no genuine issues of material fact and Plaintiff cannot support a claim for legal malpractice. Accordingly, it recommends that summary judgment be granted to Defendants on this claim.

2. *Judiciary Law § 487*

New York Judiciary Law § 487 prohibits misconduct by attorneys by prescribing that an attorney who "(1) is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party; or (2) wilfully delays his client's suit with a view to his own gain […] is guilty of a misdemeanor, and in addition to the punishment prescribed therefor by penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."[8] To recover, the plaintiff must present

---

[8] The Court notes that in the District Court's decision on the prior motion to dismiss, Judge Arcara concluded that "a criminal conviction for violating Judiciary Law § 487 is not a condition precedent to

evidence that the defendant acted with either "intent […] to deceive, or a chronic, extreme pattern of legal delinquency that proximately caused the appellant's alleged damages." *O'Connell v. Kerson*, 291 A.D.2d 386, 387 (2d Dep't 2002). Some New York courts have required a finding of a "persistent pattern of unethical behavior" constituting a "chronic, extreme pattern of legal delinquency," while others have found liability for a single intentionally deceitful or collusive act. *Amalfitano v. Rosenberg*, 533 F.3d 117, 123-24 (2d Cir. 2008). However, the Second Department has held that the only liability standard recognized in Judiciary Law § 487 is that of an intent to deceive. *Dupree v. Voorhees*, 102 A.D.3d 912, 913 (2d Dep't 2013); *accord Scott v. E. Hope Greenberg*, 15-CV-5527, 2017 U.S. Dist. LEXIS 50822, *36 n.17 (E.D.N.Y. Mar. 31, 2017) ("the Second Circuit has not expressly held that a plaintiff must allege a 'chronic, extreme pattern'").

Without citations to caselaw or evidence in the record, Plaintiff submits a list of actions from which she alleges Defendants' intent to deceive can be found, namely: making Plaintiff believe that D'Amato was actively engaged in attempting to settle her case; failing to advise Plaintiff that D'Amato had delegated and abrogated the essential settlement negotiation function of an attorney to a state court employee; failing to contact the insurance adjuster when the carrier invited further negotiations; failing to inform and advise Plaintiff about the course of settlement negotiations and the carrier's willingness to negotiate; failing to provide the Ziegler with the carrier's response thereby deceiving the court employee about the carrier's intentions; failing to consult with Plaintiff about pursuing her objectives; damaging Plaintiff by allowing her to enter into a high-low

---

bringing a civil claim under § 487." (Dkt. No. 26, pgs. 1-2).  He further found that the Plaintiff had alleged sufficient facts to state a claim under Judiciary Law § 487 at that stage. (*Id.*).

agreement with no discernable benefit to Plaintiff but with benefit to Defendants' law firm and the insurance carrier for the underlying defendant; and by neglecting Plaintiff's objectives by failing to act with due diligence on the settlement.

Despite these allegations, there is simply no evidence in the record of Defendants' intent to deceive or collude against Plaintiff, as required to establish a violation of Judiciary Law § 487. Plaintiff plainly testified that she does not believe Defendants lied to her, tricked her, or deceived her while handling her case. Plaintiff's interpreter, Thitakham, also testified that she had no information that Defendants misled or lied to Plaintiff or her family. Plaintiff's expert, LaDuca, could not identify any intentional deceit or collusion against Plaintiff. LaDuca stated that he believed D'Amato had only deceived himself and Ziegler by providing his own opinion about the sincerity of the insurer's response to the bad-faith letter. As discussed above, the fact that LaDuca would have interpreted the response letter differently than how D'Amato interpreted it does not establish that D'Amato intended to deceive Ziegler or anyone else. Indeed, Plaintiff offers no evidence that D'Amato believed anything other than what he conveyed to Ziegler – that he thought the response was insincere because it did not increase the settlement offer. Plaintiff does not refer to any other source to support her belief that there was intentional deceit in this case.

Based on the record, the Court concludes that there are no genuine issues of material fact and Plaintiff cannot support a claim of a violation of Judiciary Law § 487. Accordingly, it recommends that summary judgment be granted to Defendants on this claim.

19

## CONCLUSION

For the foregoing reasons, it is recommended that Defendants' motion for summary judgment (Dkt. No. 95) be GRANTED and Plaintiff's motion for summary judgment (Dkt. No. 97) be DENIED. It is recommended that judgment be entered in Defendants' favor on both of Plaintiff's remaining claims.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby **ORDERED** that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and W.D.N.Y. L. R. Civ. P. 72.   Any requests for an extension of this deadline must be made to Judge Arcara.  ***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.***   *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988).*

*Finally, the parties are reminded that, pursuant to W.D.N.Y. L.R. Civ. P. 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall*

*be supported by legal authority." **Failure to comply with these provisions may result***

***in the District Court's refusal to consider the objection.***


        **SO ORDERED.**

DATED:        June 28, 2022
              Buffalo, New York


                            */s/ Michael J. Roemer*
                            MICHAEL J. ROEMER
                            United States Magistrate Judge